## UNITED STATES ET AL. *v.* ERIE RAILROAD COMPANY ET AL.

No. 30. Argued November 1, 1929.—Decided November 25, 1929.

*Solicitor General Hughes, Assistant to the Attorney General O'Brian,* and *Messrs. George C. Butte* and *Elmer B. Collins,* Special Assistants to the Attorney General, filed a brief on behalf of the United States.

*Mr. Edward M. Reidy,* with whom *Mr. Daniel W. Knowlton* was on the brief, for the Interstate Commerce Commission.

*Mr. Marion B. Pierce,* with whom *Mr. Herbert A. Taylor* was on the brief, for appellees.

MR. JUSTICE BRANDEIS delivered the opinion of the Court.

Upon complaint of Hamersley Manufacturing Company, the Interstate Commerce Commission issued an order that the Erie Railroad Company and a connecting carrier establish an all-rail rate of 10 cents per 100 poun'

on wood pulp imported through the port of Hoboken, New Jersey, and shipped from there to Garfield, New Jersey, in carloads. *Hamersley Mfg. Co.* v. *Erie R. Co.,* 126 I. C. C. 491; 148 I. C. C. 47. The carriers brought this suit in the federal court for that State to enjoin enforcement of the order and to set it aside. The District Court granted the relief. *Erie R. Co.* v. *United States,* 32 F. (2d) 613. The case is here on direct appeal under Act of October 22, 1913, c. 32, 38 Stat. 208, 220, Act of February 13, 1925, c. 229, 43 Stat. 936, 938, amending § 238 of the Judicial Code. The sole ground for the carriers' attack on the order, and also the sole ground for the decree below, is that the shipments are wholly intrastate and, therefore, the Commission lacked jurisdiction over the rates.

The Commission found the following facts concerning the course of the business involved. The Hamersley Company makes to a New York broker, who is a commission agent for specified foreign mills, its offer to buy a certain quantity and grade of pulp manufactured abroad. The broker cables the offer to one of the foreign mills which he represents, naming the prospective purchaser. If the offer is accepted, the broker so informs the Company and then makes a contract with it in his own name, sending a copy to the mill. The contract provides for shipment from abroad during a specified period and delivery, at the agreed price, on dock New York Harbor. The mill is not named in the contract. It ships to the broker the ordered quantities marked with a brand, but not so as to show the individual customer, and cables the broker when the shipment is made, naming the steamer, the quantity, the customers, and the date of expected arrival. This information is communicated by the broker to the Company. It appears from the record that the broker pays the mill as soon as he is thus advised of the shipment; and that the ship's bill of lading is sent to him.

The pulp destined for the Company may be part of a larger shipment. But the number of bales allotted to it are always delivered at Garfield; none may be diverted to any other customer; and no pulp is shipped to the broker for sale to purchasers to be obtained while the pulp is in transit or after its arrival. Upon arrival of the pulp in Hoboken, the broker gives to a terminal company the dock orders, specifying delivery of the required number of bales, and makes out the bills of lading for shipment from there to Garfield. These papers name the ship by which the pulp arrived at the Hoboken dock. There may be some delay in forwarding the wood pulp by rail after delivery on the dock because, under an arrangement between the broker and the Company, the pulp is shipped from the dock in lots of two or three cars in order to prevent congestion at Garfield. The freight from the dock to Garfield is paid by the Company to the rail carrier. The Commission found "that from the time the pulp is placed on board steamers at foreign ports there is a continuing intent on the part of the shipper that it shall be transported to Garfield."

The carriers contend that title to the pulp does not pass to the Company until the broker arranges, at the Hoboken dock, for shipment of the specific lot to Garfield; that the shipment by the mill to its agent, as consignee, of pulp in quantity exceeding that ultimately destined to Garfield, terminates when the pulp is delivered on dock at Hoboken; that this foreign shipment is distinct from the subsequent shipment by the broker to Garfield of the smaller quantity, under a new and local bill of lading; and that therefore, the rail movement from Hoboken to Garfield is an independent intrastate transaction. But the nature of the shipment is not dependent upon the question when or to whom the title passes, *Pennsylvania R. Co.* v. *Clark Coal Co.*, 238 U. S. 456, 465–6. It is deter-

mined by the essential character of the commerce. *Baltimore & Ohio S. W. R. Co.* v. *Settle,* 260 U. S. 166, 170. It is not affected by the fact that the transaction is initiated or completed under a local bill of lading which is wholly intrastate, *Ohio R. R. Commission* v. *Worthington,* 225 U. S. 101, 108–110; *Texas & New Orleans R. Co.* v. *Sabine Tram Co.,* 227 U. S. 111; *Hughes Bros. Co.* v. *Minnesota,* 272 U. S. 469; or by the fact that there may be a detention before or after the shipment on the local bill of lading, *Carson Petroleum Co.* v. *Vial,* 279 U. S. 95. The findings of the Commission, that the broker acts only as agent and that from the time that the pulp is put aboard the steamer there is a continuing intent that it should be transported to Garfield, ought to have been accepted by the District Court as conclusive, since there was ample evidence to sustain them. *Western Paper Makers' Chemical Co.* v. *United States,* 271 U. S. 268; *Virginian R. Co.* v. *United States,* 272 U. S. 658. The rail transportation is in fact a part of foreign commerce.

*Reversed.*