## SOUTHERN RY. CO. v. EICHLER et al.
### No. 9171.

Circuit Court of Appeals, Eighth Circuit.
Feb. 9, 1932.
Rehearing Denied March 23, 1932.

Charles Clark, of Washington, D. C. (Bruce A. Campbell, of East St. Louis, Ill., and Samuel B. McPheeters and Roy W. Rucker, both of St. Louis, Mo., on the brief), for appellant.

Irvin H. Gamble, of St. Louis, Mo. (B. M. Godfrey, of St. Louis, Mo., on the brief), for appellees.

Before VAN VALKENBURGH, BOOTH, and GARDNER, Circuit Judges.

VAN VALKENBURGH, Circuit Judge.

August 6, 1926, appellees filed complaint with the Interstate Commerce Commission, involving rates upon carload shipments of certain clay articles shipped from Albion, Ill., to St. Louis, Mo. The allegation was that the said carload shipments consisted of common brick on which appellant assessed and collected a rate of $1.45 per ton under the standard brick schedule, of 2,000 pounds, whereas the applicable rate was $1.15 per ton under a note in the tariff defining a certain exception to that schedule. The difference between the amounts resulting from the total charges, figured at these two rates, was asked as reparation. November 20, 1928, the Commission ordered reparation accordingly. February 27, 1930, appellees filed suit in the District Court for the Eastern District of Missouri to enforce this order. The petition, in two counts, apparently relied upon paragraph 5 of section 1 of the Interstate Commerce Act (49 USCA p. 12, § 1 (5), prohibiting unjust and unreasonable charges for transportation service; and upon paragraph 7 of section 6 of said act (49 USCA p. 283, § 6 (7), prohibiting departure from filed and published tariffs. It was contended by appellant, with apparent reason, that, before the Interstate Commerce Commission, the charge under section 1 of the act was withdrawn, and that the only question urged was one of overcharge, prohibited by paragraph 7 of section 6. The trial court, a jury having been duly waived, in its findings of fact disposed of this contention, in conformity with the finding of the Commission, thus:

"That the rates charged on the shipments involved in this suit were inapplicable and that the applicable rates on both the large and small brick were those in effect on common brick and violates section 6 of the Interstate Commerce Act.

"That it is immaterial whether the allegation regarding the violation of Section One is sustained or otherwise for the reason that the Interstate Commerce Commission found that the rates charged were inapplicable."

It concluded that "the bricks shipped come within the provisions of Note 20 of the tariff applicable in this case and take a rate of $1.15 per ton of 2,000 pounds." Judgment in the aggregate sum of $2,448.25 was entered against appellant and other defendants, and an attorney's fee in the sum of $750 was taxed as costs under the provisions of paragraph 2 of section 16 of the Interstate Commerce Act, 49 USCA p. 7, § 16 (2).

The tariff schedules presented to the Commission and District Court for interpretation are embraced, according to expert testimony in the record, in Southern Railway Illinois Local Tariff No. 1171–H, I. C. C. No. C–2098. Item 49 describes the articles to which a rate of $1.45 per ton of 2,000 pounds is applicable as follows:

"Brick and articles taking brick rates carloads, minimum weight 60,000 pounds, except when a car of less capacity is furnished, in which case marked capacity of the car will govern. * * * Rates apply on the following articles made of clay or shale, except as otherwise indicated.

"Articles, Broken or Ground (See Broken or Ground Articles.)

"Blocks, viz:

"Building (Solid, Hollow or Perforated), except enameled.

"Condensing (including condensing Rings).

"Facing (Solid, Hollow or Perforated), except enameled.

"Furnace.

"Paving (including Asphalt Paving Blocks), Shale or Fire Clay.

"Radial.

"Salt Glazed, when shipped in same manner as Building or facing block, individual block not being packed.

"Segment (Vitrified).

"Silo.

"Tank.

"Brick, viz:

"Building (Solid, Hollow or Perforated), except enameled.

"Chrome.

"Corundite.

"Facing (Solid, Hollow or Perforated), except enameled.

"Fire.

"Furnace.

"Magnesite.

"Paving, Shale or Fire Clay.

"Radial.

"Salt Glazed, when shipped in same manner as building or facing brick, individual brick not being packed.

"Sand Cement.

"Sand Lime.

"Silica.

"Tank.

"Brick, Common."

In connection with the "Brick, Common," appearing in this item, reference is made to note 20, wherein a rate of $1.15 is published, where the distance is not more than one hundred and fifty miles, applicable thus: "Rates on common brick apply on brick, common, not hollow, made from low-grade clay or shale, loaded to the marked capacity of the car, and when not braced, wedged or packed for protecting against rubbing, breaking, or chipping, not including any grades (firsts, seconds, thirds, or culls) of enameled, face, front, paving, fire or refractory brick."

It is conceded that this tariff and the schedules quoted were prescribed by the Interstate Commerce Commission. Their history is disclosed in the reports of various cases heard and considered by the Commission. The mention of common brick, so far as appears from the citations brought to our attention, first appears in Metropolitan Paving Brick Co. v. Ann Arbor R. R. Co. et al., 17 I. C. C. 197, 200 (1909), in which the Commission said: "In the consideration of these [rate-making] questions common building brick, so called, has no place. This grade of brick is produced from ordinary clay at kilns in practically every community, and moves on local rates for short distances only."

It concludes that "competition between the different grades of brick is of such a character that no scheme of classification is possible which will not permit, if it does not encourage, the misbilling of the product in order to secure lower rates."

In National Paving Brick Mfg. Ass'n v. Alabama & V. R. Co. et al., 68 I. C. C. 213, 217 (1922), the Commission found: "What is strictly known as common brick is a non-vitrified brick produced from local or low-grade surface clay found practically everywhere. It is the cheapest brick in any locality and, unlike other brick and tile, usually moves for short distances only," and that the general size of common brick is 8 by 2¼ by 3¾ inches. It also found further that: "For distances not in excess of 150 miles, rates on common brick, as defined in this report, when loaded at random to the marked capacity of the car without protection against chipping or breaking, will be unjust and unreasonable to the extent that they exceed 80 per cent of the contemporaneous rates on articles in the uniform brick list, which basis we find will be just and reasonable."

It was the judgment of the Commission that, "if the lower basis of rates is confined to what is more strictly termed common brick, namely, brick not vitrified, made from low-grade surface clay, loaded loose in the cars without straw or other protection against breakage, and shipped for distances not in excess of 150 miles, the carriers should experience no great difficulty in policing the movement. The characteristics of such common brick are usually well known in the territory in which they are produced and this is particularly true of the Chicago common brick."

This was known and is referred to as the "General Brick Case."

In 1923 another case arose between the same parties. 80 I. C. C. 179. The definition of common brick set forth in the foregoing case is restated, and the demand by manufacturers of common brick made of low-grade shale, that the description of common brick be broadened to include such brick as well as brick made of low-grade clay, was granted.

The commodity forming the subject-matter of this controversy consisted of a shale product, 8½ by 3¾ by 4⅝ inches in size. It was shipped to appellees at St. Louis, Mo., between April 16, 1925, and December 25, 1925, by the Albion Shale Brick Company from Albion, Ill., and was loaded loosely in the cars, not braced, wedged, or packed for protection against rubbing or breaking in transit. It will be seen that the article was considerably larger than the standard size of common brick, and, for this reason apart from others, it is variously characterized in the testimony before Commission and court. It was called a "dobie," a localized expression for a clay or shale commodity about twice the size of a standard common brick, by Aegerter, a constructional engineer, and by building contractors Boaz, Humes, and

Schmoll, all of whom said that a common brick and a dobie were different kinds of brick. The one would not be a compliance with plans specifying the other. The article was called an "industrial block" by Williams of the Hydraulic Press Brick Company; a "dobie or building block" by Carlisle, manager of the plant in which it was made, and from which it was sold; a "building block" by Young of the Southern Weighing and Inspection Bureau. Grath, one of the appellees, calls it a "double common brick," and Tiley, of McEwing-Thomas Brick Company, a "large size building brick." It originated and came into favor, because it cost less to produce, in consideration of its comparative size, and further, because of its size, it "saves to the bricklayer about half of the mortar, which is quite an item of building, and considerable labor in laying."

The errors assigned and chiefly relied upon may be considered under two heads:

(1) The Interstate Commerce Commission was without jurisdiction of the subject-matter of this action.

(2) There is in the record no substantial evidence, within the federal rule, sufficient to support the finding and conclusion that the commodity shipped was common brick within the tariff definition contained in note 20 of the governing tariff.

These specifications of error were duly preserved by appellant's requests for declarations and conclusions of law, the court's refusal thereof, and the allowance of an exception to this ruling.

■■ Appellant's contention under the first point is based upon the fact that appellees, in effect, abandoned their contention of unreasonable charges under paragraph 5 of section 1 of the Interstate Commerce Act, relying upon paragraph 7 of section 6 of said act, prohibiting departure from filed and published tariffs. The contention was that the commodity shipped came under the common brick description contained in note 20 aforesaid, and not under the provisions of the standard uniform brick schedule of the published tariff. This contention was adopted by the Commission and by the District Court. In this view, the question at issue resolved itself into one of law, requiring the construction of a tariff, and appellant urges that this is a question for the court alone, and not one within the jurisdiction of an administrative body. While it may freely be admitted that the submission of pure questions of law, to a body in which the rules of evidence are relaxed, and the hearing assumes

an informal character, must necessarily be less satisfactory, nevertheless, the jurisdiction of the Commission to entertain the complaint of any person claiming to be damaged by any common carrier subject to liability under the provisions of the Interstate Commerce Act has been broadly conferred by the Congress (section 9, 49 USCA p. 328), and this jurisdiction has been consistently recognized. National Elevator Co. v. Railway Company (C. C. A. 8) 246 F. 588; Pennsylvania R. R. Co. v. Clark Coal Co., 238 U. S. 456, 470, 35 S. Ct. 896, 59 L. Ed. 1406; Louisville & Nashville R. R. Co. v. Ohio Valley Tie Co., 242 U. S. 288, 291, 37 S. Ct. 120, 61 L. Ed. 305; Chicago, B. & Q. R. R. Co. v. Feintuch et al. (C. C. A. 9) 191 F. 482; Hormel & Co. v. Chicago, M. & St. P. R. Co. (C. C. A. 8) 283 F. 915, 918; Standard Oil Co. v. United States (D. C.) 41 F.(2d) 836, 842, affirmed 283 U. S. 235, 51 S. Ct. 429, 75 L. Ed. 999.

If an order for reparation is made by the Commission, it can be enforced only by suit in some court of general jurisdiction. Section 16, 49 USCA p. 6. Thus the constitutional provisions guaranteeing trial by jury and due process of law (Const. U. S. Amendments 7 and 14) are satisfied. Meeker & Co. v. Lehigh Valley R. R. Co., 236 U. S. 412, 35 S. Ct. 328, 59 L. Ed. 644, Ann. Cas. 1916B, 691.

With respect to the second contention of appellant, we are confronted with the statutory provision that, in the trial in the District Court of the suit to enforce an order of the Commission, "the findings and order of the Commission shall be prima facie evidence of the facts therein stated." The burden is thrown upon appellant, therefore, to overcome the prima facie case made. The trial court based its conclusion largely upon this consideration. Much, then, depends upon what the Commission actually found, and what that finding, supplemented by proceedings before the District Court, imports.

This subject-matter, under different titles, has been before the Commission a number of times. The original conception of that kind of common brick subject to the lower transportation rate, as described in note 20, was, as stated in National Paving Brick Mfg. Ass'n v. Alabama & V. R. Co. et al., supra, "a nonvitrified brick produced from local or low-grade surface clay found practically everywhere." This characteristic found its way into the tariff description, and has been consistently retained in the schedules. Upon subsequent application, "low-grade shale" was added. In the case last cited, it was em-

phasized that the lower basis of rates should be confined to "what is more strictly termed common brick, namely, brick not vitrified, made from low-grade surface clay" (or shale). There can be no doubt that the low-grade character of the clay or shale was regarded as the important, if not the controlling, characteristic of the classification entitling the commodity in question to a lower transportation rate, and it was expressly embodied in the tariff description of that commodity.

In a hearing involving this same product (McEwing & Thomas Clay Products Co. v. Chicago & E. I. R. Co., 118 I. C. C. 211), division 1 of the Commission held, October 29, 1926, that the uniform brick list rate of $1.45 per ton was applicable. November 20, 1928, division No. 2 reached the same conclusion; Commissioner McManamy dissenting. The case was reconsidered by the Commission as a whole, and Commissioner McManamy delivered the opinion upon which the order sought to be enforced in this action is based. In this opinion, he calls attention to the fact that all of the rates in question were established to comply with the decision of the Commission in National Paving Brick Mfg. Ass'n v. Alabama & Virginia Ry. Co., 68 I. C. C. 213, and 80 I. C. C. 179, to which we have referred, as announcing the quality of common brick taking the lower rate of $1.15 per ton. He then states the Commission's final reasons for declaring the lower common brick rate applicable to the article under consideration. He says:

"In accordance with the decision in National Paving Brick Mfg. Ass'n v. A. & V. Ry. Co., supra, the governing tariff limited the application of the common-brick rates to brick defined as follows:

"Brick, common, not hollow, made from low-grade clay or shale, loaded to the marked capacity of the car, and when not braced, wedged, or packed for protection against rubbing, breaking, or chipping, not including any grades (firsts, seconds, thirds, or culls) of enameled face, front, paving, fire, or refractory brick.

"None of the brick in question were hollow. All of them were made from low-grade clay or shale, and all were loaded to the marked capacity of the cars. They were not braced, wedged, or packed for protection against breaking or chipping. None of the shipments included any of the lower grades of enameled, face, front, paving, fire, or refractory brick. Thus it is clear that all of the brick under consideration met all the requirements of the tariff definition of common brick."

His argument throughout, however, negatives the idea that the article before us responds to the lower tariff rate definition of common brick. This is made evident by the repeated reference to what he considers the "intention" of the Commission in prescribing the rates established by the governing tariff, as witness:

"It is quite clear, therefore, that *it was our purpose* to prescribe the uniform brick list rates on all articles similar to those specifically included in that list and to prescribe the 80 per cent, or common-brick basis, on all articles possessing *the same general transportation characteristics* as common brick. * * * *It was undoubtedly our intention* to prescribe common brick rates on articles such as those included in No. 18677.

"The larger articles are loaded in the same way and in the same equipment as the smaller common brick. Both move in the same trains and over the same routes from Albion to St. Louis. *From a transportation standpoint* there is no difference in the handling of the smaller and larger articles. Having these facts in mind, it is obvious that the charging of a higher rate on the larger article than on the smaller would violate both sections 1 and 2 of the act." (The italics are ours.) It was thus the purpose of the majority of the Commission to include under the definition of common brick entitled to the lower transportation rate all other articles "possessing the same general transportation characteristics as common brick." This ruling ignores the fact that the published tariff permits departure from the uniform brick list only with respect to expressly defined commodities. This view is clearly expressed in separate opinions by two of the Commissioners. Commissioner Aitchison says:

"I am unable to agree with the conclusion of the majority that the building blocks are 'common brick' within the meaning of the tariff description. Furthermore, I do not favor the indiscriminate extension of the common-brick basis to every article which may possibly compete with the low-grade common brick accorded the 80 per cent rates. As originally prescribed the standard rates were of general application subject to the exception accorded short-haul shipments of common brick made of low-grade surface clay. As interpreted by the majority the exception will soon become the general basis, with the standard rates applying only on the higher-grade articles. The reasoning of the reports

in support of the prescription of the lower basis on these blocks would lead with equal propriety to a similar extension in favor of the seconds or culls of face, fire, or paving brick and low-grade hollow building tile.

"The majority have construed the tariff description in this case as a definition of common brick. In doing so they lose sight of the most important part of the description, namely, the words 'common brick.' The matter which follows is restrictive, not inclusive, and merely indicates the particular kinds of common brick entitled to the lower basis of rates. The conclusion that these blocks come within the tariff description is in effect a holding that they are common brick of an uncommon size. The very statement demonstrates its inconsistency.

"In my opinion the rates charged on the blocks were applicable and not unreasonable. I am authorized to state that Commissioner Woodlock concurs in this expression."

Commissioner Brainerd has this to say:

"I do not construe the tariff description in this report as a definition of 'common brick.' All that this description sets forth is the particular kind of common brick which is entitled to the 80 per cent rate, such as common brick which is not hollow, or which is made from low-grade clay or shale, etc. But this description throws no light on the tariff question as to what constitutes 'common brick.' However, it appears elsewhere in the report that these blocks are a low-grade commodity, certainly of as low a grade as common brick, as we ordinarily use that term. It would necessarily follow that the rates charged are unreasonable to the extent that they exceeded the common-brick basis. As I view the situation the rates charged on these blocks were applicable, but unreasonable to the extent that they exceeded the rates on common brick."

To grant reparation on this latter basis would conflict with the recent decision of the Supreme Court in Arizona Grocery Company v. Atchison, Topeka & Santa Fé Ry. Co., 52 S. Ct. 183, 186, 76 L. Ed. ——, rendered January 4, 1932, in which it is said: "Where the Commission has upon complaint, and after hearing, declared what is the maximum reasonable rate to be charged by a carrier, it may not at a later time, and upon the same or additional evidence as to the fact situation existing when its previous order was promulgated, by declaring its own finding as to reasonableness erroneous, subject a carrier which conformed thereto to the payment of reparation measured by what the Commission

now holds it should have decided in the earlier proceeding to be a reasonable rate."

It may be added that appellees finally planted themselves firmly upon the tariff description and not upon the matter of reasonableness of the rate.

It is true that, in his opinion, Commissioner McManamy meticulously ascribes to the product under consideration all the characteristics and qualities required to belong to common brick entitled to the lower transportation rate. He ignores the uniform testimony to the contrary by pronouncing it a common brick, and then finds that it is made from low-grade clay or shale. The question is whether this finding is sustained by substantial evidence. On this point the trend of the testimony before Examiner Disque is illuminating. We may preface our examination of the record by the statement that the previous investigations and reports of the Commission establish the fact that there are both high and low grades of clay and shale used in brick manufacture. The intendment of the testimony for complainants, throughout the hearing before Examiner Disque, was directed to establish their contention, not that there was no such thing as low-grade clay or shale in the brick industry, but rather that both common brick, and brick of higher grades, might be made from the same grade of clay or shale, depending upon the manner in which it is manufactured and burned. This use of the term "common brick" does not distinguish between that quality of common brick which falls within note 20 and that which takes the uniform brick list rate, as pointed out by Commissioners Aitchison and Brainerd. It may be true that a kind of common brick may be made out of higher grade clay or shale, but such does not fall within the tariff exception to the uniform brick schedule. It was obviously the desire of complainants that the terms "low-grade clay or shale," found in note 20 of the tariff, should be ignored or that the tariff should be amended to exclude those terms, as witness:

"Exam. Disque: Did the carriers or the Commission fix this eighty per cent basis?

"Mr. Godfrey (for complainants): That was the decision of the Commission in 68 I. C. C. 213, National Paving Brick Manufacturers Association v. Alabama & Vicksburg Railway. * * *

"Exam. Disque: I assume that your point is that the tariff should be amended to read as follows: 'Brick or blocks, common, made out of low grade or high grade shale?'

"Mr. Godfrey: Yes, there would be no

necessity of amending the tariff if they would determine it is a brick. If they determine it is a block then the 80 per cent scale should include exhibit number 1.

"Exam. Disque: Then you want the tariff amended to modify this brick description to read as I have stated, that the rates on common brick should be lower—20 per cent lower than the others, the description should be 'brick or blocks, common, made from low grade as well as high grade shale?'

"Mr. Godfrey: Of course, we contend that is a brick and the tariff needs no—

"Exam. Disque: The Commission may disagree with you. I am trying to get your idea of what you want the Commission to do in case the Commission finds this is a block and not a brick.

"Mr. Godfrey: Eliminate the words 'low grade clay or shale'—low grade, because all of our witnesses have testified that this is a misnomer.

"Exam. Disque: And all of the defendant's witnesses have testified this stuff is made out of high grade shale; so what is the Commission going to do about it?

"Mr. Godfrey: And I believe Mr. Carlisle testified they could make common brick and face brick from the same article and the same batch of clay.

"Mr. Cook: He says it is high grade shale, though. * * *

"Mr. Godfrey: It is our contention that the character of shale should be eliminated for the reason that our witness, with 45 years experience, stated he never heard of any such thing. * * *

"Mr. Godfrey: What I would describe as common brick or block, not packed, wedged or braced in the car, not including face, front, fire, refractory, enameled brick—following that description in Southern Railway tariff 1171 G.

"Exam. Disque: You want 'low grade' cut out, but you are willing to have continued the provision as to packing the goods, and the enamel, face, refractory brick, and so forth? * * *

"Exam. Disque: I would like to know from somebody who was responsible for this requirement it must be low grade. Who is responsible for this tariff provision it must be made of low grade shale? Is that the Commissions' finding or the carrier's?

"Mr. Behring: The Interstate Commerce Commission found that because of the fact there was so much low-grade brick manufac-

tured around Danville going into Chicago. They made a 150 mile distance to cover that, and that is in the record in that case.

"Mr. Young: You will find a thorough description of that in 10,733, and you will find where the Hydraulic people at St. Louis testified that they were using clay to make face brick. * * *

"Exam. Disque: Did the Commission or the carriers put this provision in the tariff 'made from low grade clay or shale?'

"Mr. Godfrey: I think that is the Commission's decision in 80 I. C. C. 179.

"Exam. Disque: Why do you want the Commission in this case to reverse what it did in the other case?

"Mr. Godfrey: For the reason that no manufacturer will acknowledge he makes any material out of anything other than high grade shale.

"Exam. Disque: The Commission apparently considered that and formally said 'low grade clay or shale.' Here is your chance to prove the Commission made a mistake. Why should the Commission eliminate the words 'low grade clay or shale?'

"Mr. Grath: For this reason, common brick, as Mr. Carlisle testified, and as I have stated, and as every other manufacturer will state, can be made out of a high grade shale, and they do that to make the common brick in order to meet competition from other manufacturers that also make common brick, and just because brick from a certain manufacturer is made out of a shale what they consider high grade, because they make paving brick and face brick out of it, that is no reason why their common brick should take the face brick rate, when they are made for common brick and sold as common brick and called for as common brick, in order to meet competition on other makes of standard bricks."

From the foregoing the conclusion is inescapable that what the complainants demanded, and what the Commission in effect did by its ruling, was to amend the tariff to include, for the lower rate, a commodity not within its terms, but one which, "for transportation purposes," the Commission thought ought to have been included. If it were to be conceded that this article is a common brick, there is no substantial testimony in the record, if any at all, that it is a common brick made of low-grade clay or shale. Mr. Carlisle, manager of the Albion Shale Brick Company, testified in the most positive manner that the shale from which this article was

made is a high-grade material. In proof of this, it is shown that it is adapted to the manufacture of paving brick, and is disqualified for making face brick only because it is not uniform in color. All the products from these kilns are shipped at the high tariff rate because made out of high-grade shale. Mr. Carlisle termed a high-grade shale as one that would burn without too much shrinkage.

Mr. I. N. Young is district manager for the Southern Weighing and Inspection Bureau. The Albion plant in which this article was manufactured is located in his territory. Concerning the Albion shale he said:

"It is the heat effect that brings out the strong enduring qualities of the brick when laid to the weather, but the contention of the Bureau is that the shale at Albion is a high grade of shale, and that neither any brick made there, common, face, paving or otherwise, can come within the terms of the tariff because of the fact that the shale is a high grade of shale and the tariff specifies that common brick, along with some other qualifications, must be made from a low grade of shale. The distinguishing qualities we find in shale is plasticity, bonding strength, shrinkage, and the vitrification properties. Any clay or shale that has those properties in unification and commensurately distributed through the shale, producing one day with another, under the test of heat, shows it to be, and confirms it to be, a high grade of shale.
\* \* \*

"Exam. Disque: Mr. Carlisle, do you agree with the witness' statement as to what constitutes high grade shale, or do you know?

"Mr. Carlisle: Yes, sir.

"Exam. Disque: Is that the kind of shale you have at your place?

"Mr. Carlisle: Yes, sir."

We have then, this positive testimony, as to the high-grade quality of this commodity, against the negative testimony that common brick may be made out of almost any grade of material. This negative testimony is ineffective to prove that the article in question is made of low-grade material, or that it does not fall within the class of common brick subject to the uniform schedule rate of $1.45 per ton. In other words, there is no testimony of any substance whatever that this article, whether brick, dobie, or block, was made of low-grade clay or shale; but positive testimony that it was made of high-grade material. It may be that from "a transportation standpoint" this article could and should be properly included in the classification of

commodities bearing the lower rate of carriage; but this cannot be accomplished by an arbitrary departure from a tariff, filed and published in compliance with the order of the Commission, nor by ignoring the express requirements of that tariff. Arizona Grocery Co. v. Atchison, Topeka & Santa Fé Railway Company, supra.

The trial court did not find that the article under consideration was made of low-grade clay or shale. Rather it found "that it is not the clay or shale that constitutes the quality of the brick, but it is the method of manufacturing or the length of time required in burning the brick." It found further that the "value of the bricks in this controversy is practically the same as common brick"—making no distinction between different grades of common brick—and that "the bricks involved in this suit were used in buildings as a *substitute* for common brick." (Italics ours.) Its conclusion that the so-called bricks come within the provision of note 20 of the applicable tariff flows from the following assigned reasons:

"First: Under the evidence and the weight of the evidence the plaintiffs are entitled to a judgment in their favor against the defendants in this case.

"Second: Because the finding of the Interstate Commerce Commission was for the right parties and made a prima facie case, and that defendants have not introduced any evidence to overcome the finding of said commission."

In our judgment, neither of these conclusions finds support in the record.

We are not unmindful of the effect to be given to findings of the Interstate Commerce Commission in matters strictly within its jurisdiction. The general rule is that: "Courts will not review determinations of the Commission made within the scope of its powers or substitute their judgment for its findings and conclusions." United States and Interstate Commerce Commission v. New River Company, 265 U. S. 533, 542, 44 S. Ct. 610, 613, 68 L. Ed. 1165; United States v. Erie R. R. Co., 280 U. S. 98, 50 S. Ct. 51, 74 L. Ed. 187; Spiller v. Atchison, T. & S. F. Ry. Co., 253 U. S. 117, 40 S. Ct. 466, 64 L. Ed. 810; Illinois Central R. R. v. Commission, 206 U. S. 441, 27 S. Ct. 700, 51 L. Ed. 1128; East Tennessee, etc., Ry. Co. v. Commission, 181 U. S. 1, 21 S. Ct. 516, 45 L. Ed. 719; Famechon Co. v. Northern Pac. R. R. Co. (C. C. A. 8) 23 F.(2d) 307.

But the evidence may always be examined to ascertain whether the findings of

the Commission are properly supported (Florida v. United States, 282 U. S. 194, 215, 51 S. Ct. 119, 75 L. Ed. 291); and, in an action to enforce reparation awarded a shipper, the findings and order of the Commission are prima facie only, and not conclusive evidence of the facts therein stated. This provision of statute (section 16, Interstate Commerce Act) "only establishes a rebuttable presumption. It cuts off no defense, interposes no obstacle to a full contestation of all the issues, and takes no question of fact from either court or jury. At most, therefore, it is merely a rule of evidence." Meeker & Company v. Lehigh Valley R. R., 236 U. S. 431, 35 S. Ct. 328, 59 L. Ed. 644, Ann. Cas. 1916B, 691. The rules governing the construction of a tariff are comprehensively stated by Mr. Justice Brandeis in Great Northern Ry. v. Merchants' Elevator Company, 259 U. S. 285, 291, 292, 42 S. Ct. 477, 479, 66 L. Ed. 943. He says:

"What construction shall be given to a railroad tariff presents ordinarily a question of law which does not differ in character from those presented when the construction of any other document is in dispute.

"When the words of a written instrument are used in their ordinary meaning, their construction presents a question solely of law."

However, "where technical words or phrases not commonly understood are employed, or extrinsic evidence may be necessary to establish a usage of trade or locality which attaches provisions not expressed in the language of the instrument," resort must be had to the Commission for a preliminary determination. The case of Texas & Pacific Ry. Co. v. American Tie & Timber Co., 234 U. S. 138, 34 S. Ct. 885, 58 L. Ed. 1255, illustrates the situation last described. There the question was whether the general term "lumber" in the tariff was used in a peculiar sense and was broad enough to include oak railway cross-ties; a question upon which, it was said, there was a great diversity of opinion among experts. In this case a different situation is presented. The words in the tariff are used in their ordinary meaning. The whole objective of the appellees before the Commission was to have the words "low-grade clay or shale" ignored or stricken from the tariff, and that tariff, in effect, amended to that extent, and to include a commodity not within its terms. This is what the Commission did, and this is what the Supreme Court in substance has said cannot be done with respect to past transactions.

If, upon reconsideration, the Commission finds that this particular product, or common brick generally, should, from a transportation standpoint, move under the lower rate, let it direct that the filed and published tariffs be so revised as to express that situation to the understanding of carriers and shippers alike. We think the judgment below should be reversed, and the cause remanded for further proceedings not inconsistent with this opinion. It is so ordered.

## On Petition for Rehearing.

### PER CURIAM.

Appellees have filed a petition for rehearing in the above-entitled cause, alleging as grounds therefor that the finding of the Commission was that the brick in controversy was made of low-grade clay or shale, and that the evidence before the Commission supports this finding. It is therefore urged that, in such case, the courts will not review determinations of the Commission made within the scope of its powers, nor substitute their judgment for its findings and conclusions.

In support of this contention, the petition recites the testimony of two witnesses, James D. Robertson and J. B. Howard, said to have been given in other hearings before the Commission, upon which, in part, appellees contend, the finding of the Commission was based. We freely concede the established rule that the findings of the Commission, made within the scope of its powers, and based upon substantial evidence, are conclusive, and not subject to review by the courts. [8] This appeal is to review the judgment of the District Court rendered in a suit to enforce an order of the Interstate Commerce Commission. In that action the order of the Commission is made prima facie evidence of the findings made by it. It is for this reason that appellate courts have a duty to examine the evidence for the purpose of ascertaining whether such findings are substantially supported; and, in so doing, they are confined to the record presented for review. In that record we find the order of the Commission sought to be enforced, the testimony of witnesses introduced at the trial, and appended as Exhibit A, is docket No. 18677 of the Interstate Commerce Commission in Illinois Supply Company v. Southern Railway Company, which exhibit purports to contain the evidence before the Commission which pertained to this particular controversy, and upon which the Commission's order in question was based. At the conclusion of the bill of exceptions, in the transcript before us, is a recital that it contains all the evidence offered

at the trial. Nowhere in the record do we find any testimony of James D. Robertson or J. B. Howard, either as quoted in the petition for rehearing or otherwise; nor was it contended at the hearing before us that the record did not contain everything essential to the proper disposition of the case. We are not permitted to go outside that record in this appeal, nor to entertain excerpts from testimony alleged to have been given in other hearings, and under circumstances not subjected to legal safeguards in the trial court. We have carefully considered the evidence preserved and presented for review, and are satisfied that the conclusion reached is correct.

The petition for rehearing, therefore, is denied.