WALLING, Administrator of the Wage and Hour and Public Contracts Division, United States Department of Labor, v. VILLAUME BOX & LUMBER CO.

No. 353.

District Court, D. Minnesota, Third Division.

April 14, 1943.

154

James M. Miller, of Minneapolis, Minn., and Frank P. Ryan, of St. Paul, Minn., for plaintiff.

Harold L. Rutchick and Richard S. Felhaber, both of St. Paul, Minn., for defendant.

SULLIVAN, District Judge.

### Truck Drivers

It is the contention of the plaintiff that the truck drivers are engaged in commerce, as the same is defined in the Fair Labor Standards Act, 29 U.S.C.A. § 203, and therefore are entitled to the benefits flowing from said Act.

On the other hand, the defendant contends that the truck drivers do not come within the coverage of the Fair Labor Standards Act relating to maximum hours, 29 U.S.C.A. § 207, because of Section 13 (b) (1) of the Act, 29 U.S.C.A. § 213(b) (1), which reads as follows: "(b) The provisions of section 207 of this title shall not apply with respect to (1) any employee with respect to whom the Interstate Commerce Commission has power to establish qualifications and maximum hours of service pursuant to the provisions of section 304 of Title 49."

The applicable section of the Motor Carrier Act of 1935, 49 U.S.C.A. § 304, provides, inter alia, that "It shall be the duty of the Commission [Interstate Commerce Commission]—to regulate common carriers by motor vehicle * * * and to that end the Commission may establish reasonable requirements with respect to * * * qualifications and maximum hours of service of employees, and safety of operation and equipment. * * * [and] to establish for private carriers of property by motor vehicle, if need therefor is found, reasonable requirements to promote safety of operation * * *."

Other applicable provisions of the Motor Carrier Act of 1935, 49 U.S.C.A. are as follows:

"§ 302.  *Application of provisions*

"(a) The provisions of this chapter apply to the transportation of passengers or property by motor carriers engaged in interstate or foreign commerce and to the procurement of and the provision of facilities for such transportation, and the regulation of such transportation, and of the procurement thereof, and the provision of facilities therefor, is hereby vested in the Interstate Commerce Commission."

"§ 303.  *Definitions and exceptions*

"(a) Definitions.  As used in this chapter—

 * * * * *

"(10) The term 'interstate commerce' means commerce between any place in a State and any place in another State or between places in the same State through another State, whether such commerce moves wholly by motor vehicle or partly by motor vehicle and partly by rail, express, or water.

 * * * * *

"(17) The term 'private carrier of property by motor vehicle' means any person not included in the terms 'common carrier by motor vehicle' or 'contract carrier by motor vehicle', who or which transports in interstate or foreign commerce by motor vehicle property of which such person is the owner, lessee, or bailee, when such transportation is for the purpose of sale, lease, rent, or bailment, or in furtherance of any commercial enterprise.

 * * * * *

"(19) The 'services' and 'transportation' to which this chapter applies include all vehicles operated by, for, or in the interest of any motor carrier irrespective of ownership or of contract, express or implied, together with all facilities and property operated or controlled by any such carrier or carriers and used in the transportation of passengers or property in interstate or foreign commerce or in the performance of any service in connection therewith.

"(20) The term 'interstate operation' means any operation in interstate commerce."

The defendant company was at all times engaged in the manufacture of boxes and wood products.  The boxes which the

company manufactured were for patrons of the company in Minnesota. The truck drivers, in the performance of their duties, never crossed a state line. There is some evidence that on rare occasions the truck drivers delivered boxes to Hudson, Wisconsin, but such deliveries, according to the testimony of the defendant, constituted a very small percentage of the business of the defendant company. So we have here boxes being processed, in the first instance, by the defendant company, with some of the boxes being further processed by another company also within the State of Minnesota which, after being fully processed, were then delivered to defendant's customers in Minnesota. These customers packed and filled said boxes with their respective products, which were destined without the State of Minnesota. Can it be said that, under such circumstances, the truck drivers of the defendant company were engaged in the transportation of any of the merchandise of the defendant without the State? I think not.

We must bear in mind that the coverage of the Wage and Hour Law is all-enveloping as to labor having to do with the processing of merchandise intended to be moved in interstate commerce. The Motor Carrier Act relates only to the transportation—to the actual carriage—of goods from one state to another.

The participation of the truck drivers with respect to "producing goods intended for interstate commerce" was in the work and labor expended by said persons in the delivery of the boxes to the customers of the defendant company within the State. When that was accomplished, the labors of the truck drivers with respect to the boxes ceased and terminated. The deliveries of the boxes by the defendant were not to a public carrier. The interstate movement had not commenced. There was no intention on the part of the defendant, the truck drivers, or the customers of the defendant company, that the boxes should continue in interstate commerce in their then condition. In other words, these boxes which were delivered to the customers of the defendant company were not, at the time of their delivery to such customers, any part of a shipment or movement in interstate commerce. The packages were not then in condition or shape to be moved in interstate commerce. The interstate shipment which followed consisted of the boxes and their contents. It might be said that the boxes were merely containers of the shipment.

At an early date, in Coe v. Town of Errol, 116 U.S. 517, 6 S.Ct. 475, 477, 29 L.Ed. 715, the court stated that exportation is not begun "until they [logs] are committed to the common carrier for transportation out of the state to the state of their destination, or have started on their ultimate passage to that state."

That rule of law was affirmed in the case of The Daniel Ball, 10 Wall. 557, 19 L.Ed. 999. The doctrine as laid down in those cases has not been modified, but on the contrary has been affirmed by many subsequent decisions of the Supreme Court.

See: United States et al. v. Erie R. Co. et al., 280 U.S. 98, 50 S.Ct. 51, 74 L.Ed. 187; Hughes Bros. Timber Co. v. Minnesota, 272 U.S. 469, 47 S.Ct. 170, 71 L.Ed. 359; Philadelphia & Reading R. Co. v. Hancock, 253 U.S. 284, 40 S.Ct. 512, 64 L.Ed. 907; Baltimore & Ohio Southwestern R. Co. v. Settle et al., 260 U.S. 166, 43 S.Ct. 28, 67 L.Ed. 189; Buckingham Transportation Co. of Colo., Inc., v. Black Hills Transportation Co. et al., 66 S.D. 230, 281 N.W. 94; Railroad Commission of Ohio v. Worthington, 225 U.S. 101, 32 S.Ct. 653, 56 L.Ed. 1004.

Upon the delivery of the boxes by the defendant to its customers there was no intention on the part of the defendant that these boxes should go forward in interstate commerce. The ultimate destination of the boxes, insofar as the defendant was concerned, was either the Federal Cartridge Company or the Brown & Bigelow Company, in Minnesota. There the duty of the defendant company with respect to delivery of the boxes ceased. Further movement of any of these boxes was contingent upon their being packed with merchandise, and depended upon the demands of the customers of those two companies.

Read and compare: Atlantic Coast Line R. Co. v. Standard Oil Co. of Kentucky, 275 U.S. 257, 48 S.Ct. 107, 72 L.Ed. 270.

The coverage of the Wage and Hour Act is broad and covers any work or labor expended upon merchandise which eventually finds its way into interstate commerce, but when we come to the exceptions covered by section 13(b) (1) of the Fair Labor Standards Act, and the jurisdiction of the Interstate Commerce Commission to regulate with respect to maximum hours and safety regulations, we are met with an-

other question. We are then confronted with transportation problems, not with the preparation or processing of goods for interstate commerce, but in the actual carriage of the goods from one state to another.

It is my opinion that the truck drivers were not engaged in the transportation of goods in interstate commerce, and that they are clearly under the coverage of the Fair Labor Standards Act.

### Office Employees

■ The status of the office employees mentioned in the complaint, save and except that of Ethel Dahlberg, is not in conflict with the provisions of the Fair Labor Standards Act. While the written contracts which have been received in evidence do not disclose that free and fair negotiation on the part of the employer with employee which is desirable, and while there is some ambiguity with respect to the rate of pay which the employee is entitled to, that is, the rate per hour, still when we consider the actual construction which the interested parties placed upon the contracts, and the books and records of the defendant company in evidence showing the manner and way in which payments of wages were made and the amounts thereof, the Court is required to find compliance with the Act. It seems fair and proper, in determining whether there was a bona fide contract between employer and employee, to take into consideration, not only the written instrument, but also the construction placed thereon by the parties and the payments of wages made by the employers. All of these things, it seems to me, in this case spell out a valid contract, and one which is in accord with the rule in Walling, Administrator of the Wage and Hour Division, etc., v. A. H. Belo Corporation, 316 U.S. 624, 62 S.Ct. 1223, 86 L.Ed. 1716.

It is to be regretted that any ambiguity in the written memorandum of hiring should exist. The times call for free and frank dealings between employer and employee. The days of keeping the employee in the dark as to the terms and conditions of his employment are past. I think it was probably the intention of the employer to make a frank and open written memorandum of the hiring arrangement, but because of misadvice, the form introduced in evidence was adopted. The records of the company were inspected by those entrusted with the enforcement of the Wage and Hour Law, about November, 1941. Since the date of such inspection all work records have been kept with meticulous care, and in accordance with the Act, save and except the few which are hereinafter mentioned.

I am unable to perceive any violation of the Act with respect to the office employees, save as to Miss Dahlberg, subsequent to October 25, 1940. Certain of the employees of the company were not paid correctly, but an attempt has been made by the company to correct these errors.

Miss Dahlberg was employed from August 15, 1941, at a monthly salary of $75 per month. She was not paid overtime compensation for hours in excess of forty per week, as required by the Act of 1938. She has, however, been employed at an hourly rate since the date of inspection, and has been paid for overtime work since that date.

### Other Employees

The employment of Michael J. Polack as an engineer and Joseph Helget as a watchman is in conflict with the mandates of the Act in the particulars called attention to in the Findings of Fact herein.

### Injunction

■ The Act provides for the issuance of the statutory injunction. The right of the Administrator as a public officer to seek an injunction stands upon different ground from that of a private party who seeks to invoke injunctive relief in a court of equity. In this case we are not concerned with the enforcement and protection of private rights, but with the enforcement of a public act which seeks by the injunction provided for under certain circumstances to deter future violations of the Act.

There are numerous decisions under the Fair Labor Standards Act in which, upon a showing of substantial past violations, it has been held that an injunction should issue, despite the discontinuance of the violations after their discovery by the Administrator, and despite good faith assurance of future compliance. Fleming v. Mason & Dixon Lines, D.C., 42 F.Supp. 230; Walling v. Builders' Veneer & Woodwork Co., D.C., 45 F.Supp. 808; Fleming v. Jacksonville Paper Co. et al., 5 Cir., 128 F.2d 395; Fleming v. Cincinnati Union Terminal Co., 6 Cir., 117 F.2d 1012.