**ALASKA FREIGHT LINES, INC.**

v.

**The UNITED STATES.**

No. 319–63.

United States Court of Claims.

May 12, 1967.

Alan F. Wohlstetter, Washington, D. C., attorney of record, for plaintiff. Denning & Wohlstetter, Ernest H. Land, Washington, D. C., and Wallace Aiken, Seattle, Wash., of counsel.

John Charles Ranney, Washington, D. C., with whom was Asst. Atty. Gen., Barefoot Sanders, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner C. Murray Bernhardt with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in a report and opinion filed on August 3, 1966. Exceptions to the commissioner's findings and recommended conclusion of law were filed by defendant and exceptions to certain of the commissioner's findings were filed by plaintiff and the case is submitted to the court without argument of counsel. Since the court agrees with the commissioner's findings, opinion and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Plaintiff is, therefore, entitled to recover and judgment is entered for the plaintiff in the sum of fifty-five thou-

sand, one hundred ninety-four dollars and six cents ($55,194.06).

## OPINION OF COMMISSIONER *

BERNHARDT, Commissioner:

The specific problem before the court is whether a division agreement for the apportionment of rail revenues between the plaintiff interstate motor carrier and the Government-owned Alaska Railroad Company is to be construed to permit the Railroad to charge plaintiff for the interchange of freight at the Railroad's Seward Dock at Seward, Alaska, when plaintiff's motor carrier competitors who, unlike plaintiff because they utilize the services of certain ocean carriers having traffic agreements with the Railroad, are for that reason exempt from the freight interchange charges at Seward under otherwise identical conditions. If the agreement with plaintiff permits such charges, the query then devolves whether an illegal restraint on interstate commerce is entailed which renders unenforceable the disputed term of plaintiff's division agreement, leaving the residue undisturbed.

Plaintiff provides an integrated land-sea-land carrier service by motor vehicle between the States of Washington and Alaska. When at relevant times its laden vans and trailers reached Anchorage on barges and towboats owned by plaintiff's seagoing affiliate, Alaska Container Marine Service, Inc., they were normally discharged and driven by road to their destinations in Alaska. But when the Anchorage harbor was seasonably icebound, the plaintiff's vessels discharged the vans and trailers at the more southerly and hence ice-free Seward Dock, where they were transferred to flatcars of the Alaska Railroad and carried "piggy-back" by rail to Anchorage, Palmer or Fairbanks, thence dismounted and driven with their cargoes intact to their consignees.

The Railroad maintained facilities at the Seward Dock to transfer unloaded ocean freight to its freight cars for rail transportation elsewhere in Alaska. Its Division Sheet 1–E was a rate agreement with participating motor carriers (of which plaintiff was one) to apportion the rail revenues received from shippers the transportation of whose freight was being accomplished in continuous sequence by the motor carrier and the Railroad. This agreement for so-called "substitute freight service" provided in general that terminal charges (wharfage, handling, car loading and unloading) for the interchange of freight at Seward to the Railroad would be added to the regular rail transportation charges for intrastate shipments (item 10–B(a)1), but would be included in the rail transportation charges for "inter-line" shipments (item 10–B(a)2) when the freight was delivered to the Seward Dock by ocean carriers which had entered into interchange traffic agreements with the Railroad. Such carriers are hereafter referred to as contracting carriers, for convenience, as distinct from "itinerants" or noncontracting ocean carriers.

It happened that plaintiff's sea-going affiliate, which carried plaintiff's vans and trailers from Seattle to Seward in barges and towboats, did not have a traffic agreement for freight interchange with the Railroad during the relevant period (November 1961–January 1963) and was thus an itinerant or noncontracting ocean carrier, although the Railroad had offered such an agreement and for aught it appears accepting it would not have disadvantaged the plaintiff in any particular way. Eventually, in February 1963 the plaintiff's affiliate capitulated and entered into a traffic agreement with the Railroad, thus eliminating future controversies of this sort. The Railroad accepted plaintiff's vans and trailers for transportation from Seward, but because of the lack of a traffic agreement charged the plaintiff $55,194.06 in terminal charges for the interchange of freight to flatcars at Seward Dock, in addition

* The opinion, findings of fact, and recommended conclusion of law are submitted under the order of reference and Rule 57(a).

to the regular rail transportation charges. This is the sum sued for.

The plaintiff contends that Division Sheet 1–E had no provision specifically applicable to shipments such as those involved here, i. e., interstate shipments carried to Seward by itinerant noncontracting ocean carriers. From this the plaintiff deduces that neither paragraph 1 nor 2 of item 10–B(a) applies to the shipments in dispute, and that, therefore, the shipments should be free of Seward terminal charges under the general rule set forth in item 25 of the Division Sheet which provides that rail transportation charges shall include Seward terminal charges for interchange services "except as otherwise noted". The plaintiff not only denies that paragraph 2 of item 10–B(a) constitutes such an exception pertinent to its situation, but also argues that as a matter of law the Railroad's only right under the agreement was to have refused to accept plaintiff's shipments at Seward, and that by accepting them the Railroad was obligated to perform the interchange and transportation services and waived any rights to demand payment for the interchange services because of the automatic application of charge-exempting item 25. If this is not the case, plaintiff then falls back on the contention that otherwise that aspect of the agreement would be an illegal restraint on interstate trade. This residual argument is predicated on the fact that plaintiff's motor carrier competitors whose freight was shipped from Washington to Alaska by one or the other of the only two ocean carriers which had interchange traffic agreements with the Railroad would have a competitive advantage over plaintiff by being exempt from the Seward interchange charges, while plaintiff had to pay them.[1]

Supplement 11 to Division Sheet 1–E was issued effective August 13, 1960, superseding certain relevant paragraphs extant since April 18, 1960. The later version, reprinted in finding 8, was in force throughout the period of the shipments in suit. The defendant concedes that the superseded provisions would give some validity to plaintiff's present contentions that paragraphs 1 and 2 of item 10(a) [2] in the Division Sheet related to intrastate and interstate movements, respectively and exclusively, but claims that the changes made by Supplement 11 clearly prove plaintiff to be in present error. Accordingly, it is desirable to examine both the old and the new.

Under the earlier version of Division Sheet 1–A, paragraph 1 of item 10(a) provided for the performance of substitute service by the Railroad for intrastate motor carrier transportation between Anchorage and Fairbanks only. No terminal charges for interchange service at Seward Dock (or elsewhere, for that matter) were assessed, since the only intrastate substitute service then provided did not involve Seward. Supplement 11 amended paragraph 1 of item 10(a) by extending the area of substitute intrastate service to include shipments by motor carriers between Seward and Anchorage/Fairbanks/Palmer alternately, in addition to the existing Anchorage-to-Fairbanks route. In extending the coverage to include Seward, the Supplement 11 amendment to the Division Sheet specified that terminal charges would be assessed for freight interchange services over Seward Dock in connection with such intrastate movements.

Supplement 11 also changed paragraph 2 of item 10(a) of Division Sheet 1–A. Whereas the earlier form of the paragraph was designated "Substitute

---

1. The Garrison Fast Freight Division of Consolidated Freightways, Inc., and Weaver Brothers, Inc., offered integrated services similar to those of plaintiff, but, for the water service between Washington and Alaska, used the services of Alaska Steamship Company and Puget Sound-Alaska Van Lines, both of which latter carriers had traffic agreements with Alaska Railroad for the interchange of freight at Seward Dock.

2. In the Supplement 11 amendment to Division Sheet 1–E, item 10 was renumbered 10–B. Thus, for instance, item 10(a) 1 and 2 of the original Division Sheet became item 10–B(a) 1 and 2.

Service-Interstate", and applied to shipments from Seward to Anchorage-Fairbanks, the amended paragraph in force during the shipments with which we are concerned was not only redesignated "Substitute Service—Inter-line", but also added the Seward-to-Palmer route to the cities previously served. Both the superseded and new versions of paragraph 2 specified that interstate or inter-line substitute service was available only "when such freight [which] has been routed via the Motor Carrier is delivered to The Alaska Railroad at ship's tackle, Seward, Alaska, by ocean carriers with whom The Alaska Railroad has Traffic Agreement for interchange of freight." Neither the old nor the new version of paragraph 2 affirmatively assessed terminal charges for freight interchange at Seward Dock, so obviously none applied to the category of shipments therein specified, for item 25 of Division Sheet 1–A laid down as stated above the general rule that "Charges for the transportation of trailers will include the service of wharfage, handling, car loading or unloading subject to the Divisions and Rules contained herein, *except as otherwise noted.*" [Emphasis supplied.]

 In the context of the case it is thus clear that terminal charges for interchange services at Seward Dock were chargeable under the agreement to motor carriers in an intrastate movement under paragraph 1, but not to an interline movement under paragraph 2 where the freight arrived at Seward on a contracting ocean carrier. The Supplement 11 change in the title of paragraph 2 of item 10(a) in Division Sheet 1–A from "Substitute Service—Interstate" to "Substitute Service—Inter-line" may or may not be significant to the issues here. Interline freight is freight moving from point of origin to destination over the lines of two or more transportation lines; whereas interstate traffic or freight is that which moves from a point in one state to a point in another state, or between points in the same state but passing within or through another state en route, or between points in the United

States and foreign countries. Interline freight is not necessarily, but may be, interstate in character. The revised paragraph 2 was apparently designed to relate to both types, viz.: intrastate when two or more transportation lines combine in one continuous freight movement within Alaska arriving at Seward from elsewhere in Alaska whether by road or by sea on itinerant noncontracting vessels, thence piggy-backed by rail to Palmer, Fairbanks or Anchorage; or interstate when, and only when, the traffic arrives in Seward from another state or foreign country by a contracting ocean carrier. Two things become clear from this analysis: (1) the only express exemption of intrastate or interstate motor freight from the Seward Dock interchange charges for substitute freight service was in the case of freight landed at the Seward Dock from a contracting ocean carrier; and (2) neither paragraph 1 nor 2 of item 10–B(a) of Division Sheet 1–A explicitly covers the plaintiff's precise situation, unless by distorted inference, for the shipments in issue originated in Washington and arrived at Seward on itinerant noncontract vessels.

The defendant's contention that plaintiff's shipments came under paragraph 1 of item 10–B(a) necessarily supposes them to have been intrastate in character, for that is the only type of shipment to which paragraph 1 relates. Defendant's reasoning: (1) while plaintiff's tariff allowing it to convert part of its land movement by motor vehicle to trailer on flatcar service was filed with the Federal Maritime Board as purely a matter affecting interstate commerce, that tariff is not in issue (Division Sheet 1–A is); (2) it covers the relations between plaintiff and its shippers and the Railroad was not a party to it; (3) when the shipments moved in Alaska by rail they were not subject to the Federal Maritime Board but moved on the Railroad's local bills of lading rather than on plaintiff's commercial bills of lading or Government bills of lading; and (4) the Railroad was also not a party to the plaintiff's bills of

lading covering the shipments to Seward. *Ergo,* the two phases of each such shipment dovetailed at Seward, the one being interstate to Seward, and the other (and germaine one) being the separate intrastate movement from Seward on by rail to destination. Defendant concludes that the plaintiff wants the best of all possible worlds by filling the roles of both motor carrier and rail shipper simultaneously as to the same intrastate rail service, contrary to the Interstate Commerce Act, citing Substituted Freight Service, 232 I.C.C. 683, 690 (1939).

 The reasoning is appealing but invalid. By accepting plaintiff's trucks and trailers at Seward for transfer to flatcars the Railroad, an intrastate carrier, subjected itself to the plaintiff's arrangement for the continuous carriage of an interstate shipment. Cincinnati, N. O. & Tex. Pac. Railway v. Interstate Commerce Comm., 162 U.S. 184, 16 S.Ct. 700, 40 L.Ed. 935 (1896). " * * * the nature of the shipment * * * is determined by the essential character of the commerce. * * * It is not affected by the fact that the transaction is initiated or completed under a local bill of lading which is wholly intrastate, * * *." United States v. Erie R. R., 280 U.S. 98, 101, 102, 50 S.Ct. 51, 53, 74 L.Ed. 187 (1929). Cf. Baer Bros. Mercantile Co. v. Denver & R. G. R. R., 233 U.S. 479, 34 S.Ct. 641, 58 L.Ed. 1055 (1914); Texas & N. O. R. R. v. Sabine Tram Co., 227 U.S. 111, 33 S.Ct. 229, 57 L.Ed. 442 (1913); Railroad Comm. of Louisiana v. Texas & Pac. Ry., 229 U.S. 336, 33 S.Ct. 837, 57 L.Ed. 1215 (1913). Plaintiff's shipments originating in Washington and bound for points in Alaska were clearly interstate in nature, and their character as such was not interrupted or converted to intrastate shipments by the issuance of the Railroad's local bills of lading for the rail haul from Seward to other points in Alaska. Nor were they converted *ipso facto* into intrastate shipments merely because they did not fit into the pattern of interline shipments specified in paragraph 2 of item 10–B(a) by not having been delivered to Seward Dock by ocean carriers having traffic agreements with the Railroad.

 It has been observed that plaintiff's shipments in issue fit neither paragraph 1 nor 2 of item 10–B(a) of Division Sheet 1–E, yet the Railroad accepted them at Seward and provided substitute service by interchanging the cargo to flatcars for rail delivery to points beyond. The Railroad had the legal right under its Division Sheet 1–E agreement with plaintiff to refuse to accept at Seward these nonconforming shipments, but it did not have the right to accept them and then charge the plaintiff for interchange costs not provided by the contract. By accepting the shipments under these circumstances either one of two legal consequences ensued, both of which would defeat the Railroad's right to assess terminal charges. One possible consequence is that an unwritten, implied traffic agreement came into being for interchange between plaintiff and the Railroad for each shipment so handled, thereby tacitly supplying the equivalent of a formal traffic agreement. Alternatively, and more likely, by accepting the shipments the Railroad waived the plaintiff's failure to qualify for exemption from terminal charges through the execution of a formal traffic agreement.[3] When a provision of a contract is not met, the party for whose benefit the provision was inserted (in this case the Railroad) may treat the failure as a default and refuse to proceed under the contract, or he may elect to waive the default and proceed under the contract, in which case he will be held to the remaining terms of the agreement. Autrey v. Williams and Dunlap, 343 F.2d 730, 736–737 (5th Cir. 1965); Restatement of Contracts, § 309; Williston on Contracts, (3d ed.) § 688. The Railroad having waived the plaintiff's noncompli-

---

3. Waived, too, by the same acquiescence were certain technical omissions in plaintiff's bills of lading required by item 60 of Division Sheet 1–E (finding 13).

ance with the requirements of item 10–B (a) of the Division Sheet 1–E, it is now estopped from asserting the lack of a traffic interchange agreement as a defense to a refund of the terminal charges improperly assessed against Alaska Freight's shipments.[4]

It is superfluous to discuss the plaintiff's additional theory that, if the Division Sheet 1–E agreement were to entitle the Railroad to charge plaintiff interchange fees at Seward, such an agreement would be unenforceable as an unlawful restraint on interstate commerce and a discrimination against Alaska Freight *vis-à-vis* its motor carrier competitors.

Plaintiff is entitled to judgment in the sum of $55,194.06.

---

4. The Alaska Railroad is not a common carrier subject to the provisions of the Interstate Commerce Act but is an arm of the Federal Government purchased and completed from public funds and performing a governmental function. 34 Op.Atty. Gen. 232 (1924).