# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued November 10, 2020     Decided January 22, 2021

No. 20-1013

AIRCRAFT SERVICE INTERNATIONAL, INC., D/B/A MENZIES
AVIATION, ET AL.,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION AND UNITED
STATES OF AMERICA,
RESPONDENTS

CENTRAL FLORIDA PIPELINE LLC AND KINDER MORGAN
LIQUIDS TERMINALS LLC,
INTERVENORS

On Petition for Review of an Order
of the Federal Energy Regulatory Commission

*Matthew D. Field* argued the cause for petitioners. With him on the briefs was *Richard E. Powers, Jr.*

*Lona T. Perry*, Deputy Solicitor, argued the cause for respondents. With her on the brief were *Makan Delrahim*, Assistant Attorney General, *Michael F. Murray*, Deputy Assistant Attorney General, U.S. Department of Justice, *Robert J. Wiggers* and *Robert B. Nicholson*, Attorneys, *David L. Morenoff*, Acting General Counsel, Federal Energy Regulatory

Commission, and *Robert H. Solomon*, Solicitor.

*Amy L. Hoff* argued the cause for intervenors. With her on the brief were *Deborah R. Repman*, *Charles F. Caldwell*, *Daniel W. Sanborn*, and *Susan B. Kittey*.

Before: WILKINS and RAO, *Circuit Judges*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* SILBERMAN.

SILBERMAN, *Senior Circuit Judge*: Petitioners, led by several Airlines,[1] challenge FERC's determination that fuel transported by pipeline to Orlando's airport—after being delivered to the Port of Tampa—moves intrastate. Therefore, the Commission decided that it lacked jurisdiction to regulate the rates for transporting the jet fuel. We easily reject the petition.

---

[1] Petitioners include American Airlines, Delta Airlines, Southwest Airlines, United Aviation Fuels (wholly owned by United Airlines), and United Parcel Service. All operate aircraft at the Orlando International Airport. Two companies formed by the Airlines, Hookers Point Fuel Facilities and Aircraft Service International, also join the petition. Hookers Point runs fuel storage operations for the Airlines. Aircraft Service manages the receipt and reallocation of fuel in Tampa. It also arranges for shipments of the Airlines' fuel through the Central Florida Pipeline and oversees the supply of fuel in Orlando.

**I**

FERC adopted the extensive findings and recommendations of the ALJ, so we shall refer to the ALJ's opinion and FERC's decision as one and the same.[2]

This case concerns the transportation of jet fuel from outside the state of Florida to Tampa, then from Tampa to the Orlando airport. The fundamental issue before the Commission was whether the Central Florida Pipeline—which connects the Tampa and Orlando fuel storage terminals—is one link in a continuous movement as determined by the original and persisting intent of the shipper. Or did storage and other activities in Tampa break the continuity of interstate movement? *See, e.g.*, *Baltimore & Ohio Sw. R.R. Co. v. Settle*, 260 U.S. 166, 173–74 (1922); *Interstate Energy Co.*, 32 FERC ¶ 61,294, 61,690 (1985). If continuous, the pipeline transportation falls within FERC's jurisdiction, and the charged rates (now unregulated by the state of Florida) would be subject to federal oversight. *See Frontier Pipeline Co. v. FERC*, 452 F.3d 774, 776 (D.C. Cir. 2006).

Forty years ago, FERC set forth the framework that it uses to answer this question. *See Northville Dock Pipe Line Corp. & Consol. Petrol. Terminal, Inc.*, 14 FERC ¶ 61,111, 61,207 (1981); *see also Transp. of Petrol. and Petrol. Prods. by Motor Carriers Within a Single State*, 71 M.C.C. 17, 29 (1957). Whenever fuel crosses state lines and subsequently moves within a state by pipeline, FERC begins with the presumption that the fuel's entire journey is interstate commerce. *Guttman Energy, Inc.,* 161 FERC ¶ 61,180, at *12 (2017). In *Northville Dock*, the Commission focused on three

---

[2] Of course, FERC expressly rejected the same arguments that the Airlines raise here. But since the dispute focuses on the adopted decision, we see no need to separately describe the Commission's review.

factors to determine whether a stop within a state breaks the continuity of interstate transportation:

> (1) At the time of shipment, there is no specific order being filled for a specific quantity of a given product to be moved through to a specific destination beyond terminal storage;

> (2) The terminal storage is a distribution point or local marketing facility from which specific amounts of the product are sold or allocated; and

> (3) Transportation in the furtherance of this distribution within the single state is specifically arranged only after a sale or allocation from storage.

*Northville*, 14 FERC at 61,207 (The *Northville* Factors) (cleaned up). All three factors need not be satisfied for FERC to conclude that the continuity of movement has ceased. *See Guttman*, 161 FERC ¶ 61,180, at *18. But when all are, that is enough to establish that the continuity of transportation has "been broken," and the interstate journey has ended. *Interstate Energy*, 32 FERC at 61,690.

To establish that *Northville* was to be applied, FERC observed that the fuel stopped at the Tampa Terminal. When jet fuel is offloaded in Tampa, the ALJ explained, it does not smoothly flow from a ship, through the terminals, and into the Central Florida Pipeline. Rather, it remains in the Tampa Terminal for a minimum of one to four days. The Airlines did not contest this point before the ALJ. And, since the fuel came to rest in Tampa, the ALJ proceeded to assess each of the *Northville* factors.

First, the ALJ determined that the Airlines placed no *specific order* for a *specific quantity* of fuel for delivery *to Orlando* at the time of shipment. The Airlines' supply contracts specify Tampa—not Orlando—as the delivery point

for the fuel.[3]  And the Airlines pipe fuel to Orlando based on inventory targets in Orlando, not the quantities delivered in Tampa.  The supply contracts themselves are quantity estimates and are thus not "specific."   Furthermore, neither of the Airlines' two fuel suppliers, Valero or Chevron, ship their fuel for receipt by any specific airline.  Valero preloads its ships without regard to the quantity requested by an airline.  Chevron, on the other hand, loads its vessels based on aggregate orders placed by multiple airlines.  But, upon delivery in Tampa, the fuel is allocated among Chevron's customers based on their current inventory levels—not the amount they ordered.  It can hardly be said, moreover, that any airline's fuel order is specific because all fuel is commingled in transit and storage.

Next, the ALJ found that the Tampa Terminal also functioned as non-operational storage as well as a local marketing and distribution point. By non-operational, FERC refers to storage activities separate and apart from the daily needs at the Orlando airport.  On average, the ALJ determined that jet fuel remains stored in Tampa for 9.5 to 12 days before it is shipped inland.  And when that fuel is shipped, it goes towards maintaining optimal inventory levels in Orlando—not day-to-day functions.  The ALJ also explained that, because jet fuel is fungible, the Airlines trade it among themselves in Tampa.  This business activity—localized in Tampa—allows Airlines to reallocate fuel as needed.   The ALJ similarly described how the Tampa Terminal serves as a distribution point from which specific amounts of jet fuel are allocated for further transportation.  Although most fuel is piped to Orlando

---

[3] The ALJ noted that some monthly nominations, which are precursors to supply contracts, indicated that fuel would end up at "MCO" (the Orlando Airport).  But these were not specific orders because the nominations did not "specify . . . when individual shipments must occur, or the amount of jet fuel that must be delivered in individual shipments." J.A. 130.  Therefore, with respect to timing and quantity, they are even less specific than the supply contracts.

in batches, about ten percent is trucked to other regional airports in response to specific airline requests.

Last, the ALJ found that onward transportation to Orlando is arranged only after the fuel is allocated from the Tampa Terminal. Although jet fuel remains in the Tampa Terminal (on average) for over a week, the Airlines designate fuel for pipeline shipment only a few days in advance. The Airlines may revise their shipment even as the jet fuel enters the Central Florida Pipeline. Thus, the ALJ concluded, "for all practical purposes" the shipments over the Central Florida Pipeline are always arranged after the jet fuel has arrived in Tampa. J.A. 216.

With all three *Northville* criteria satisfied, the ALJ found that the stop in Tampa broke the continuity of interstate transportation, and so the jet fuel moved intrastate through the Central Florida Pipeline. FERC therefore lacked jurisdiction to regulate the pipeline rates. The Commission affirmed this conclusion despite acknowledging the Airlines' professed "overarching intent to ship jet fuel from . . . locations outside of Florida to the Orlando Airport." J.A. 265. FERC explained that "the manner in which [the Airlines] effectuate this intent, when looked at [] objectively," shows that the pipeline movement is intrastate in nature. J.A. 265.

## II

Petitioners advance four challenges in a rather scattershot fashion. They assert that, assuming *Northville* was good law, FERC misapplied it. They follow with the argument that *Northville* is too narrow an analytical framework, as FERC itself has recognized. Third, they contend that FERC's decision contradicts Supreme Court precedent. Finally—and this is key—the Airlines argue that their "overarching intent" to transport the fuel from ships through Tampa to Orlando means the pipeline movement is interstate in nature.

Taking these arguments in order, Petitioners contend that FERC misapplied the *Northville* factors primarily because the Tampa Terminal was not a distribution point or local marking facility. The Airlines emphasize that there were only four spot sales from the Tampa Terminal over five years. In their view, this is insufficient to establish local marketing activity under the second *Northville* factor.

But this is not what FERC relied upon to find the second factor satisfied. The Airlines treat the jet fuel in Tampa as a fungible pool and trade it among themselves. FERC found that this was local business activity. It was determined that any airline could run a negative balance on their account—a practice called negative inventory—by shipping more fuel to Orlando than they theoretically owned in the Tampa Terminal. This practice is more than just an accounting function, as Petitioners claim. Airlines are borrowing from the accounts of others, and this borrowing is much more frequent than any occasional aberration. One airline, for example, ran negative inventory 185 times during the five-year period FERC reviewed. We think the Commission was quite reasonable in determining that the Tampa Terminal was a local marketing facility.

Next, Petitioners contend that the *Northville* factors are inadequate to make this important determination. According to the Petitioners, the Commission itself recognized this point in its recent *Guttman* decision. *See* 161 FERC ¶ 61,180, at *12, *18. But *Guttman* involved not an intermediate terminal, rather a connection point of one pipeline to another. *Id.* at *5, *14–15. Because that did not fit the classic *Northville* paradigm, FERC employed twelve additional factors to determine whether there was a break in interstate transportation. Ironically, in this case, FERC found that at least nine of those twelve additional factors would support its decision. And only one—referring to the lack of additional processing in the Tampa tanks—clearly weighs in favor of the Petitioners. We

think that is too slim a reed on which Petitioners can rely to claim precedential support.

Then, Petitioners bring out the big legal guns, asserting that the Commission misinterpreted the teachings of old Supreme Court cases: *Texas & New Orleans R.R. Co. v. Sabine Tram Co.*, 227 U.S. 111 (1913); *Carson Petrol. Co. v. Vial*, 279 U.S. 95 (1929); *United States v. Erie R.R. Co.*, 280 U.S. 98 (1929). The three cases, *Sabine*, *Carson*, and *Erie*, all determined that a stop in transit did not break the continuity of an interstate movement.

But all three involved pauses that were incidental to and supportive of continued movements. In *Sabine*, lumber for export came to a stop after it was unloaded by a railroad at port, requiring only the delay necessary to transfer the lumber from rail to the ship. 227 U.S. at 126. *Carson* involved oil for export held in a port's storage tanks only as long as necessary for a ship—or the minimum quantity of oil for shipment—to arrive. Again, the stop was only due to the failure of the ships to arrive at the same time as the oil. 279 U.S. at 108–09. A common thread in these two cases is obvious: The goods came to rest solely to facilitate continued transportation. On the other hand, when goods stop for another purpose—such as for distribution or allocation—it may be sufficient to break the continuity of transportation. *See, e.g.*, *Atl. Coast Line R.R. Co. v. Standard Oil Co. of Ky.*, 275 U.S. 257, 268–69 (1927); *cf. Northville*, 14 FERC at 61,207 (asking whether a terminal serves as a "distribution point or local marketing facility").

Turning to *Erie*, it involved a transfer of wood pulp for import from a ship to rail, and transport was delayed in order to prevent congestion at the rail destination. 280 U.S. at 101. So again, this case involved a stop incident to the transportation itself. Furthermore, as the Commission noted, the broker in *Erie* placed orders for a specific number of bales of wood pulp. *Id*. These bales were specifically identified for through shipment to a specific customer, and the bales maintained their

specific identity through the entire shipment. *Id*. Of course, where these factors are not present, the shipper is less likely to have the intent to move the product in a continuous interstate movement. *See Northville*, 14 FERC at 61,207 (asking whether there is a specific order for a specific quantity to be shipped to a specific location).

Petitioners quibble with FERC not about the holdings of these cases or their distinctions from our case. Rather, they take issue with how the Commission described the distinctions. Petitioners assert—rather extraordinarily—that FERC's imprecise distinctions make the Commission's opinion arbitrary and capricious.

That contention has no merit. As long as the Commission understood the holdings and saw the distinctions, it is of no matter if the Commission's description of a judicial precedent is supposedly sloppy. We are not talking about the Commission's interpretation of a statute or a rule, but rather Supreme Court opinions, which we can read ourselves. *See SFPP, L.P. v. FERC*, 967 F.3d 788, 795 (D.C. Cir. 2020) (giving no deference to the Commission's interpretation of judicial precedent). Petitioners' objection is not substantial; it is legal nitpicking.

That brings us to the core of Petitioners' complaint. They argue that their business model, jointly coordinating fungible fuel storage and shipments to Orlando, is the only way this process can be done efficiently. They reiterate that the Airlines have an "overarching intent" to deliver fuel to Orlando. But as FERC correctly responded, whether or not Petitioners have developed an efficient business model is of little significance in determining whether the stop in Tampa ends the interstate movement.

As to the Airlines' so-called "overarching intent" to deliver fuel efficiently to Orlando, the short answer is that factor is always present in cases in which the Commission (and

the Supreme Court) determines whether an intermediate stop breaks the continuity of interstate transportation. In *Atlantic Coast*, for instance, oil was delivered to the Port of Tampa, and then stored for subsequent rail distribution to bulk and service stations within the state of Florida. 275 U.S. at 263–64. The entire business of the shipper was set up to facilitate the distribution of oil to its customers. *Id*. at 267. As such, it was apparent that the shipper had an "overarching intent" to efficiently move fuel from out of state to its stations. The Supreme Court nevertheless held that the within-state movements were intrastate transportation based on the objective facts of the transportation. *Id.* at 267–68. In other words, if overarching intent for ultimate distribution were the key, then continuity—upon which the Supreme Court relies—would be irrelevant.

Although the Supreme Court, and FERC, have used the "original and persisting intent" of the shipper to determine the essential character of the commerce, those words can be overread. A careful examination of all the relevant cases indicates that the phrase does not really refer to the shipper's subjective motive as to the good's ultimate destination. The test refers to whether, using *objective* manifestations of the shipper's intent, an interstate movement has ended, and the goods have continued in intrastate transit.[4]

Accordingly, the petition is denied.

*So ordered.*

---

[4] In addition to the foregoing, Petitioners have made other, peripheral arguments that we have considered and reject without written opinion.