# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued November 10, 2020                Decided July 30, 2021

No. 19-7105

LARRY KLAYMAN,
APPELLANT

v.

JUDICIAL WATCH, INC., ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:06-cv-00670)

———

*John P. Szymkowicz* argued the cause for appellant. With him on the briefs was *John T. Szymkowicz. Larry E. Klayman* entered an appearance.

*Richard W. Driscoll* argued the cause and filed the brief for appellee.

Before: WILKINS and RAO, *Circuit Judges*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* RAO.

RAO, *Circuit Judge*: Larry Klayman founded and ran Judicial Watch, a conservative watchdog group with the motto "Because No One is Above the Law." This appeal concerns his departure from Judicial Watch in 2003 and the resulting hostility between Klayman and the Judicial Watch officers currently at its helm. Klayman filed a complaint against Judicial Watch and those officers asserting an array of claims, and Judicial Watch fired back with a series of counterclaims. During the fifteen years of ensuing litigation, Klayman lost several claims at summary judgment and then lost the remaining claims after a jury trial. The jury ultimately awarded Judicial Watch $2.3 million. On appeal, Klayman raises numerous issues spanning every stage of litigation, including discovery, pretrial, trial, and post-trial. Despite the volume of his challenges, none is meritorious. We affirm the district court.

I.

Larry Klayman founded Judicial Watch in 1994 and served as its Chairman and General Counsel until his departure in 2003. Klayman and Judicial Watch have divergent accounts of why he left the organization. According to Klayman, he left voluntarily to run for the U.S. Senate. According to Judicial Watch, it forced Klayman to resign due to his misconduct. We recount the facts as proven at trial and then recount the lengthy procedural history of this case.

A.

Klayman's time at Judicial Watch came to a close after a meeting in May 2003 with two Judicial Watch officers, President Thomas Fitton and Secretary Paul Orfanedes. Klayman told them that his then-wife, Stephanie DeLuca, had filed a complaint for divorce alleging infidelity and physical abuse, and he showed them a copy of the divorce complaint.

Klayman admitted he was pursuing a romantic relationship with a Judicial Watch employee. Klayman also told Fitton and Orfanedes about a violent altercation he had with DeLuca. As DeLuca later testified, Klayman "put his hands around [her] neck, and he started to shake [her] and bang [her] head against the car window." J.A. 2999. Klayman then "punched his hand into the radio," resulting in a broken hand. J.A. 3000. After hearing this information, Fitton told Klayman to resign. Negotiations over Klayman's departure ensued over the next several months.

Meanwhile, in September 2003, Judicial Watch began preparing its October newsletter, which was mailed to donors along with a cover letter signed by Klayman as Judicial Watch's "Chairman and General Counsel." After Klayman reviewed the newsletter, Judicial Watch sent it to the printer.

While the newsletter was at the printer, Klayman and Judicial Watch executed a severance agreement in which Klayman agreed to resign effective September 19, 2003. The severance agreement contains detailed provisions restricting the parties' conduct. For example, it prohibits the parties from disparaging each other, but places no limits on their ability to provide fair comment. The agreement also prohibits Klayman from having access to Judicial Watch donor lists and requires him to pay personal expenses he owed to the organization. Judicial Watch paid Klayman $600,000 under the severance agreement.

After Klayman left Judicial Watch, he ran to represent Florida in the U.S. Senate. His campaign used American Target Advertising ("ATA"), the third-party vendor that Judicial Watch used for its mailings to donors. Through ATA, Klayman's campaign obtained the names of Judicial Watch's

donors to use for campaign solicitations. Klayman lost the primary election for the Senate race.

Klayman then launched an effort he dubbed "Saving Judicial Watch." It included a website, savingjudicialwatch.org, and a fundraising effort directed at Judicial Watch donors using the names obtained from ATA for his Senate run. In promotional materials, Klayman asserted that he left Judicial Watch to run for Senate. *See, e.g.*, J.A. 2606 ("In 2003, I left Judicial Watch to run for the U.S. Senate in Florida."); J.A. 2613 (Judicial Watch "created the false impression I left for some reason other than to run for the U.S. Senate."). Klayman contended that Fitton and the Judicial Watch leadership team had mismanaged and corrupted the organization and that Klayman should be reinstated to lead Judicial Watch. After the Saving Judicial Watch campaign began, Judicial Watch received several letters from past donors who stated they would not donate to Judicial Watch until Klayman was reinstated. The hostility between Klayman and Judicial Watch continued over the next several years.

## B.

Klayman filed a complaint against Judicial Watch and several of its officers in 2006, asserting a panoply of claims. As relevant here, Klayman alleged that Judicial Watch violated the Lanham Act, 15 U.S.C. § 1125(a)(1), by publishing a false endorsement or advertisement when it sent the newsletter identifying him as "Chairman and General Counsel" after he had left Judicial Watch. Klayman also alleged that Judicial Watch breached the severance agreement's non-disparagement clause by preventing him from making fair comment about Judicial Watch. Klayman finally alleged that Judicial Watch defamed him by telling reporters that he filed this lawsuit as a tactic to avoid paying the quarter-million dollars he owed

Judicial Watch. In addition to damages, Klayman sought to rescind the severance agreement.

Judicial Watch and its officers asserted counterclaims against Klayman. Judicial Watch alleged that Klayman breached the severance agreement by gaining access to Judicial Watch donor lists and by failing to repay the personal expenses he had agreed to pay. Judicial Watch also alleged that Klayman infringed on its trademarks, "Judicial Watch" and "Because No One is Above the Law," by using them in his Saving Judicial Watch campaign. Judicial Watch later added a claim of unfair competition in violation of the Lanham Act, alleging that Klayman made false statements when he represented that he left Judicial Watch to run for Senate.

During discovery, Klayman failed to produce documents that were responsive to a set of supplemental requests from Judicial Watch. The magistrate judge ordered him to produce them. After Klayman still failed to produce those documents, the district court sanctioned Klayman by precluding him from presenting any documents, or testifying to them, in support of his claims and defenses.

The parties filed numerous summary judgment motions. The district court granted partial summary judgment in favor of Judicial Watch on several of Klayman's claims and Judicial Watch's counterclaim for the repayment of Klayman's personal expenses. This partial summary judgment left only a few claims for trial, including Klayman's breach of contract claim and Judicial Watch's counterclaims of breach of contract and Lanham Act violations.

As the trial approached, the district court ordered the parties to prepare a joint pretrial statement, including a list of witnesses and exhibits. Klayman submitted a deficient pretrial

statement by listing the testimony to be elicited from most witnesses as "all issues" and his exhibits as "all documents" on a particular topic. J.A. 1896, 1902. After several failed attempts at obtaining Klayman's compliance, the district court sanctioned Klayman by striking the defective portions of the pretrial statement. Because the parties could introduce only witnesses or exhibits listed in the pretrial statement, this sanction barred Klayman from affirmatively presenting witnesses or exhibits in support of his claims and defenses at trial.

A thirteen-day jury trial took place in 2018. The primary factual issue was the reason for Klayman's departure. Because of the sanctions, Klayman could present no evidence at trial other than his testimony,[1] in which he asserted that he left Judicial Watch to run for the Senate. To support its position that Klayman was forced to resign, Judicial Watch elicited testimony from Judicial Watch officers Fitton and Orfanedes about the meeting in which Klayman told them of his misconduct. Klayman objected that this testimony was irrelevant, but the district court overruled the objection. Judicial Watch also introduced the deposition of DeLuca, Klayman's ex-wife, in which she testified that Klayman physically assaulted her and called her vulgar names. Klayman objected to the name-calling as irrelevant, but the court admitted this testimony. The district court instructed the jury, refusing to give several instructions requested by Klayman.

---

[1] Despite its earlier sanctions precluding Klayman from presenting testimony or evidence, the court later clarified that Klayman could testify at trial. Because the sanctions only precluded Klayman from affirmatively introducing evidence, they did not preclude him from using documents that Judicial Watch introduced or cross-examining its witnesses.

The jury returned a verdict for Judicial Watch, awarding a total of $2.3 million.

The district court initially entered a judgment on the verdict against Klayman on March 15, 2018, a day after the jury announced its verdict. The court later vacated that judgment, however, so that Klayman could have more time to file post-trial motions. Klayman then moved under Federal Rules of Civil Procedure 50 and 59 for a judgment as a matter of law, a new trial, or remittitur of the damages. The court denied his motion and entered a final judgment against Klayman on March 18, 2019. Klayman moved under Federal Rule of Civil Procedure 60 for reconsideration of that denial and also sought the district court's recusal. The district court denied that motion on August 7, 2019. Klayman filed his notice of appeal on September 6, 2019.

After concluding that Klayman's appeal was timely, we proceed to address the merits. We have also considered and reject without written opinion Klayman's "peripheral arguments." *Aircraft Serv. Int'l, Inc. v. FERC*, 985 F.3d 1013, 1020 n.4 (D.C. Cir. 2021).

## II.

Judicial Watch challenges the timeliness of Klayman's appeal and so we first address this threshold issue. To appeal a judgment, a party must file his notice of appeal within thirty days of entry of the judgment. FED. R. APP. P. 4(a)(1)(A). The time to appeal is extended, however, upon the timely filing of certain motions under the Federal Rules of Civil Procedure. Those motions include one "for judgment under Rule 50(b)," "for a new trial under Rule 59," and "for relief under Rule 60 if the motion is filed no later than 28 days after the judgment is entered." FED. R. APP. P. 4(a)(4)(A). If one of those motions is

filed, the time to appeal is extended until "the entry of the order disposing of the last such remaining motion," and the appellant then has thirty days from that date to appeal. *See* FED. R. APP. P. 4(a)(4)(A). Although some refer to this extension as "tolling" the time for appeal, that description is inaccurate. Unlike tolling, which merely pauses the clock until a specified event occurs, Rule 4(a)(4)(A) effectively "re-starts the appeal time period." *See* 16A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & CATHERINE T. STRUVE, FED. PRAC. & PROC. § 3950.4 (5th ed. Apr. 2021 update).

The district court first entered a judgment on the verdict against Klayman on March 15, 2018. The court then vacated that judgment to allow Klayman to file post-trial motions. Klayman filed a motion under Federal Rules of Civil Procedure 50 and 59, seeking a judgment as a matter of law, a new trial, or remittitur of the jury verdict. The district court denied that motion and entered a second judgment—a "final judgment"—against Klayman on March 18, 2019.

At the outset, the parties both measure the timeliness of Klayman's appeal from the "final judgment" entered by the district court on March 18, 2019—not the now-vacated judgment on the verdict. *See* Judicial Watch Br. 22–23; Klayman Reply Br. 15–16. Because Federal Rule of Appellate Procedure 4(a)(4)(A) is a claims-processing rule instead of a jurisdictional rule, we hold the parties to that agreement.[2] *See* *Obaydullah v. Obama*, 688 F.3d 784, 790–91 (D.C. Cir. 2012).

---

[2] Given the parties' agreement and the district court's finding that the March 15, 2018, judgment was not a final judgment because it did not include the calculation of prejudgment interest, the district court's vacatur of its judgment on the verdict to provide Klayman with more time to file post-trial motions does not impact our analysis of the timeliness of this appeal. We note, however, that a district

After the final judgment, Klayman filed a motion for reconsideration under Federal Rule of Civil Procedure 60. A motion under Rule 60 extends the time for appeal if it is "filed no later than 28 days after *the judgment* is entered." FED. R. APP. P. 4(a)(4)(A)(vi) (emphasis added). Klayman filed his Rule 60 motion twenty-five days after the court entered its final judgment, so the motion restarted his time to appeal. Klayman then appealed within thirty days from the district court's denial of the second motion. Klayman's appeal was thus timely.

Under the current Rule 4(a)(4)(A), Klayman's motion to reconsider brought under Federal Rule of Civil Procedure 60 qualifies as a motion that can, and did, restart his time to appeal. In 1993, Federal Rule of Appellate Procedure 4(a)(4)(A) was amended to add motions under Rule 60. Judicial Watch attempts to rely on *American Security Bank v. John Y. Harrison Realty* for the proposition that "a motion to reconsider the denial of a motion for a new trial does not operate to toll the running of the appeal period." 670 F.2d 317, 320 (D.C. Cir. 1982). Yet when that case was decided, Federal Rule of Appellate Procedure 4(a)(4)(A)'s list of motions that restarted the time to appeal did not include motions under Federal Rule of Civil Procedure 60. *See* FED. R. APP. P. 4(a)(4)(A) (1981).

court may not vacate a final judgment to provide a party more time to file a motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) or a motion for a new trial or amended judgment pursuant to Federal Rule of Civil Procedure 59(b), (d), or (e). *See* FED. R. CIV. P. 6(b)(2) (prohibiting district courts from extending certain deadlines); *Wilburn v. Robinson*, 480 F.3d 1140, 1144 (D.C. Cir. 2007); *Toolasprashad v. Bureau of Prisons*, 286 F.3d 576, 582 (D.C. Cir. 2002); *see also* 4B CHARLES ALAN WRIGHT, ARTHUR R. MILLER & ADAM N. STEINMAN, FED. PRAC. & PROC. § 1167 (4th ed. Apr. 2021 update) (explaining Rule 6(b)(2)'s prohibition on district courts extending the time to appeal).

Our interpretation in *American Security Bank* of the now-outdated rule is of no consequence to this case.

Judicial Watch also argues, as a policy matter, that an appellant should benefit from restarting his time to appeal only once, preventing the proverbial second bite at the apple. Because Klayman restarted his time to appeal with his first motion for a new trial under Rule 59, Judicial Watch maintains that his second motion asking for reconsideration under Rule 60 was impermissibly successive. We need not decide whether an appellant may restart his time to appeal more than once because Klayman's motions were not successive for the purpose of his time to appeal. The parties agree that we measure the time to appeal from the final judgment. After the final judgment, Klayman filed only one motion that restarted his time to appeal—the motion under Rule 60. His earlier Rule 59 motion, which resulted in the vacatur of the judgment on the verdict, preceded the final judgment and is therefore irrelevant for the timeliness of the appeal. Although Klayman filed multiple post-trial motions, only his second motion restarted his time to appeal, so we need not determine whether an appellant may benefit from Federal Rule of Appellate Procedure 4(a)(4)(A)'s restarting more than once. We hold that Klayman's appeal was timely and proceed to the merits.

### III.

We begin with the district court's rulings before trial. Klayman challenges the district court's two sanctions against him for his pretrial conduct. We review the imposition of sanctions for abuse of discretion. *See Dellums v. Powell*, 566 F.2d 231, 235 (D.C. Cir. 1977). Neither of Klayman's sanctions was an abuse of discretion.

11

A.

First, the district court did not abuse its discretion when it sanctioned Klayman for his failure to provide any documents in response to Judicial Watch's supplemental discovery requests. After Klayman failed to provide any documents and instead objected to each request, Judicial Watch moved to compel his response. The magistrate judge granted the motion, ordering Klayman to provide documents in response to all but one request within ten days. Several months later, the magistrate judge learned that Klayman had not produced any documents in response and warned him that further noncompliance would risk sanctions. More than five months after the magistrate judge's original order, Klayman had not produced any documents, so Judicial Watch moved for sanctions. Klayman provided no response to that motion.

The magistrate judge found Klayman had conceded the motion, though the judge also found the sanction warranted on the merits and recommended that the district court sanction Klayman by precluding him from testifying or presenting documents to support his claims and defenses. Klayman objected to the recommendation, but the district court explained that he had conceded the motion by failing to respond to it before the magistrate judge. Nonetheless, the court considered Klayman's objections on the merits, but overruled them and entered the sanction.

We need not delve into the merits of this sanction because Klayman waived his challenge to it by failing to oppose Judicial Watch's motion before the magistrate judge. *See* D.D.C. LOCAL R. 7(b); D.D.C. LOCAL R. 72.2(b). Although Klayman objected to the magistrate judge's recommendation, "[i]ssues raised for the first time in objections to the magistrate judge's recommendation are deemed waived." *Marshall v.*

*Chater*, 75 F.3d 1421, 1426 (10th Cir. 1996) (collecting cases). Because Klayman conceded the sanction below, he cannot raise it for our consideration on appeal.

Even if we were to review the merits, we find no abuse of discretion in the admittedly severe sanction. A district court may sanction a party who "fails to obey an order to provide or permit discovery." FED. R. CIV. P. 37(b)(2)(A). Those sanctions may include "prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence." FED. R. CIV. P. 37(b)(2)(A)(ii). Choosing a sanction "should be guided by the concept of proportionality between offense and sanction." *Bonds v. District of Columbia*, 93 F.3d 801, 808 (D.C. Cir. 1996) (cleaned up). To assess whether a severe sanction, like the preclusion of evidence, is warranted, "the district court may consider the resulting prejudice to the other party, any prejudice to the judicial system, and the need to deter similar misconduct in the future." *Id*.

The district court reasonably determined that these factors favored sanctioning Klayman. First, Klayman's refusal to provide documents resulted in prejudice to Judicial Watch, because it had to file its summary judgment motions without an opportunity to review the documents that supported Klayman's claims and defenses. Klayman cannot avoid a finding of prejudice by pointing to the fact that he provided some discovery, including 1,047 pages of documents and interrogatory responses. The district court sanctioned Klayman for not providing discovery in response to particular requests, and Klayman has not contended that any of the 1,047 pages he produced were responsive to those requests. That he produced *some* discovery does not excuse his failure to produce *all* properly requested discovery. Second, Klayman's repeated refusal to comply with a court order prejudiced the judicial

system. His stonewalling required multiple rounds of judicial involvement from both the magistrate judge and district court, "squandering [the] scarce judicial resources (and the resources of other litigants)." *Founding Church of Scientology of Wash., D.C., Inc. v. Webster*, 802 F.2d 1448, 1458 (D.C. Cir. 1986). Third, the sanction was reasonably designed to deter future misconduct. By failing to engage in the discovery process, Klayman disrespected the court and the judicial process. *See Weisberg v. Webster*, 749 F.2d 864, 872 (D.C. Cir. 1984) (explaining that a court may impose a broad sanction to remove "an incentive to test the court" because a limited sanction "may present [a recalcitrant party] with nothing to lose and something to gain").

The court's sanction was proportional to Klayman's flagrant refusal to comply with the court's discovery order. The district court acted within its discretion by precluding Klayman from presenting documents in support of his claims and defenses.

B.

Second, the district court did not abuse its discretion when it sanctioned Klayman for his inadequate pretrial statement. A pretrial statement serves to "narrow the issues" for trial and put "the Court and the parties on notice of which issues of fact and law are in dispute." *Winmar, Inc. v. Al Jazeera Int'l*, 741 F. Supp. 2d 165, 185 (D.D.C. 2010). The pretrial statement avoids trial by ambush. Consistent with ordinary practice, the district court ordered the pretrial statement to include a list of witnesses and exhibits to be used at trial. Klayman argues that the district court sanctioned him merely for not providing sufficiently detailed descriptions of his witnesses and exhibits. That contention severely distorts the misconduct for which the court struck Klayman's pretrial statement.

When the district court ordered the parties to prepare a joint pretrial statement, it warned that the failure to conform with the order's directives could result in sanctions. Klayman rebuffed Judicial Watch's efforts to confer on the statement as ordered. He then requested an extension on the eve of the deadline for the statement, which the district court reluctantly granted.

In the pretrial statement eventually submitted, Klayman's entries flouted the court's order. First, the order required each party to submit a witness list identifying the witnesses to be called and briefly describing the testimony to be elicited. For sixteen of twenty-three witnesses, Klayman described their testimony as covering "all issues." J.A. 1896. And his twenty-fourth witness listed "[a]ll Judicial Watch employees in the last six years since Klayman left," again covering "all issues." J.A. 1898. Second, the order required each party to submit a list identifying the exhibits intended to be used. Instead of listing specific exhibits as required, Klayman listed eight general categories of documents, including one category for "[a]ll correspondence to and from Klayman and Judicial Watch concerning [a client]." J.A. 1902.

After finding the pretrial statement deficient, the district court ordered the parties to work together to revise it. Klayman failed to propose any revisions and sought another extension, again on the eve of the deadline. Although the district court granted the extension, it warned Klayman that no further extensions would be granted and failure to comply would result in striking his portions of the statement. Klayman failed to meet the deadline due to a car accident, so the court granted a third extension coupled with the same warning of sanctions. Klayman failed to meet the thrice-extended deadline. Accordingly, the district court sanctioned him by striking his parts of the pretrial statement, which precluded Klayman from

affirmatively presenting any evidence in support of his claims and defenses at trial. As the facts make plain, the district court did not sanction Klayman merely for a lack of detail; it sanctioned him for his "utter[] fail[ure] to discharge his obligations in the course of pretrial proceedings." J.A. 2017. That sanction was reasonable.

Under Federal Rule of Civil Procedure 16, a district court may sanction a party who "fails to obey a scheduling or other pretrial order." FED. R. CIV. P. 16(f) (incorporating the sanctions of Federal Rule of Civil Procedure 37(b)(2)(A)(ii)–(vii)). The district court reasonably exercised its discretion by imposing the sanction on Klayman. First, Klayman's deficient pretrial statement prejudiced Judicial Watch. Because his inadequate pretrial statement failed to narrow the issues for trial, Klayman deprived Judicial Watch of the notice of the disputes for trial that a pretrial statement is meant to afford. Second, as the district court explained, Klayman burdened the judicial system by failing to conduct "what should have been a relatively straightforward administrative task." J.A. 2020. Because of Klayman's refusal to prepare an adequate pretrial statement, the court "spent countless hours attempting to secure Klayman's basic compliance" with the court's order—to no avail. J.A. 2020. Third, the sanction was necessary to deter similar misconduct. The process of preparing a pretrial statement should not be onerous, and Klayman's sanction deters others from attempting to make it as onerous as he did.

Klayman contends that he should have received a lesser sanction, but the sanction of striking the defective parts of his pretrial statement was proportional to his misconduct. To be sure, as the district court acknowledged, this sanction was severe, as it prohibited Klayman from presenting any evidence at trial. Klayman, however, ignored the district court's repeated warnings and the multiple opportunities to comply with a

simple directive to present an adequate pretrial statement. The court attempted a variety of measures to obtain Klayman's compliance, but none alleviated his ongoing misconduct. Accordingly, the court did not abuse its discretion by striking Klayman's pretrial statement.

## IV.

We next consider the district court's grant of partial summary judgment to Judicial Watch, which we review de novo. *See Jeffries v. Barr*, 965 F.3d 843, 859 (D.C. Cir. 2020). To obtain summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "[A] dispute about a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Jeffries*, 965 F.3d at 859 (cleaned up).

Klayman challenges the district court's decision to grant summary judgment to Judicial Watch on four of his claims and one of Judicial Watch's counterclaims. We discuss each in turn, though no challenge is meritorious.

## A.

We begin with the grant of summary judgment to Judicial Watch on Klayman's claims under the Lanham Act. Among other things, the Lanham Act provides a cause of action to combat consumer confusion about a person's affiliation, such as a false endorsement or false advertising. *See* 15 U.S.C. § 1125(a)(1). Klayman alleged that Judicial Watch violated the Lanham Act by sending a newsletter to its donors that identified him as "Chairman and General Counsel" after he had left Judicial Watch. According to Klayman, Judicial Watch's

use of his name in the newsletter amounted to a false endorsement and false advertisement.

This circuit has yet to address whether a celebrity, which Klayman asserts he is, may bring a Lanham Act claim based on misleading or deceptive use of his name or likeness, though several of our sister circuits have approved of such claims. *See Parks v. LaFace Records*, 329 F.3d 437, 445–46 (6th Cir. 2003); *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 812 (9th Cir. 1997). We need not decide that question today. Even assuming such a claim is viable, the district court appropriately granted summary judgment against Klayman in this case.

There was no genuine dispute of material fact that Klayman authorized the use of his name in the newsletter, so it was neither a false endorsement nor a false advertisement. Klayman testified in his deposition that he routinely reviewed the monthly newsletter before Judicial Watch sent it out, and he affirmed that he signed the newsletter's cover letter as Chairman and General Counsel. As proven by his handwritten edits on a draft, Klayman edited the newsletter at issue, which Judicial Watch approved for printing while Klayman still worked there. When Klayman later resigned, the newsletter had already been delivered for mailing.

Klayman argues that he did not authorize the use of his name in the newsletter after he left Judicial Watch. But this argument ignores that the Lanham Act focuses on "false or misleading statements of fact *at the time they were made*." *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1053 (9th Cir. 2008) (cleaned up) (emphasis added). When Judicial Watch wrote the newsletter identifying Klayman as "Chairman and General Counsel," Klayman *was* the Chairman and General Counsel. His subsequent resignation does not render the newsletter a false endorsement or advertisement.

18

B.

We next consider the district court's grant of summary judgment to Judicial Watch on Klayman's breach of contract claim. Klayman asserted that Judicial Watch breached the severance agreement by preventing him from making fair comment in interviews. The severance agreement prohibited both parties from disparaging each other and then stated that "[n]othing in this paragraph is intended to, nor shall be deemed to, limit either party from making fair commentary on the positions or activities of the other following the Separation Date." J.A. 2586.

Klayman proffered two documents to support this claim. First, he pointed to an email from Leslie Burdick, a C-SPAN employee, stating that Fitton "asked that we don't schedule Larry [Klayman] on anything related to the case." J.A. 1278. Second, Klayman pointed to a memorandum from his campaign manager stating that "Fitton of Judicial Watch had requested that CNN not book Mr. Klayman to discuss any aspect of the case." J.A. 1247–48.

Both documents, however, are hearsay. Hearsay is a statement that "the declarant does not make while testifying at the current trial or hearing" and is offered "to prove the truth of the matter asserted in the statement." FED. R. EVID. 801(c). At summary judgment, a party need not present evidence in a form that is currently admissible. *See* FED. R. CIV. P. 56(c). But "[t]o survive summary judgment," he "must produce evidence capable of being converted into admissible evidence." *Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007) (cleaned up). As we have explained, when proffered evidence is "sheer hearsay, it counts for nothing on summary judgment." *Id.* (cleaned up).

Although Klayman suggests he could have subpoenaed the "witnesses at CNN and Cspan [sic]," he fails to explain how those unidentified witnesses' testimony would be admissible. Klayman Br. 41. For example, Burdick's email stated that Fitton "asked that we don't schedule Larry on anything related to the case." J.A. 1278. It is not clear to whom Fitton made this request—perhaps he asked Burdick directly or perhaps he asked someone else at C-SPAN who relayed the request to Burdick. If it is the latter, Burdick's statement of what Fitton told someone else would create an additional layer of hearsay. The campaign manager's memorandum contains a similar problem; it states that Fitton requested that "CNN" not book Klayman. Yet Klayman has provided no explanation of how he would cut through these layers of hearsay to have the statements admitted, and his general reference to calling witnesses from C-SPAN and CNN is not enough to carry his burden. Summary judgment was appropriate for Klayman's breach of contract claim because he failed to establish how this hearsay was "capable of being converted into admissible evidence." *Greer*, 505 F.3d at 1315 (cleaned up).

## C.

We turn to the district court's grant of summary judgment to Judicial Watch on Klayman's defamation claim. Klayman alleged that Judicial Watch defamed him by telling reporters that he filed this lawsuit as a "tactical maneuver designed to distract attention away from the fact that Klayman owes more than a quarter of a million dollars to Judicial Watch." J.A. 31 (emphasis omitted).

To prove defamation, a public figure[3] must establish, among other things, that the defamatory statement was made

---

[3] Klayman has not disputed that he is a public figure.

with "actual malice." *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 589 (D.C. Cir. 2016) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964)). Actual malice means the defendant made the statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *Id*. (quoting *Sullivan*, 376 U.S. at 280). Actual malice encompasses when "the defendant in fact entertained *serious doubts* as to the truth of his publication." *Id*. (citation and quotation marks omitted).

Klayman presented no evidence that Judicial Watch made its statement with actual malice. Because Judicial Watch knew that Klayman disputed the debt, he contends that Judicial Watch had a serious doubt about the truth of its statement. Judicial Watch, however, had conducted two audits on which it based its understanding that Klayman owed the debt. Although Klayman disputed the audits' findings, he offered no evidence that Judicial Watch harbored doubt about him owing the debt. Klayman also argues that Judicial Watch harbored a serious doubt about the truth of his owing a $250,000 debt because that amount includes debt owed by his law firm, so Klayman was not personally liable for all of it. Yet the severance agreement requires Klayman's law firm to pay Judicial Watch a debt of about $80,000, and Klayman indemnified his firm. Judicial Watch could have reasonably believed that Klayman was on the hook for his law firm's debt.

Because Klayman failed to establish a dispute of material fact that Judicial Watch made its statement with actual malice, his defamation claim could not survive summary judgment.

D.

We finally consider the district court's grant of summary judgment to Judicial Watch on its breach of contract

counterclaim. Judicial Watch asserted that Klayman breached his commitment in the severance agreement "to reimburse Judicial Watch for personal costs or expenses incurred by him during his employment." J.A. 2592. Klayman agreed to pay those reimbursements within seven days of receiving notification of the reimbursement amounts.

Undisputed evidence established that Klayman failed to reimburse Judicial Watch for his personal expenses as required by the severance agreement. Judicial Watch presented a declaration from Susan Prytherch, its Chief of Staff, who had reviewed Klayman's expenses at Judicial Watch to determine whether they were personal or business expenses. She attested that Judicial Watch sent Klayman fifty-one invoices for his personal expenses that included explanations of the charges and supporting documentation, but he had not paid any. Judicial Watch also submitted copies of those invoices.

Klayman renews his argument that the invoices were fraudulent documents manufactured after the fact. Yet Klayman has failed to support that assertion with anything other than his say-so, nor has he provided any evidence that he did not owe the expenses listed on the invoices. Klayman has thus failed to create a genuine dispute of material fact, and the district court correctly granted summary judgment to Judicial Watch on its counterclaim.

In sum, we affirm the district court's grant of partial summary judgment to Judicial Watch.

V.

After the partial summary judgment, only a few claims remained for trial. We turn to Klayman's challenges to two lines of evidence admitted at trial. This court reviews the

admission of evidence for abuse of discretion. *See Henderson v. George Wash. Univ.*, 449 F.3d 127, 132–133 (D.C. Cir. 2006). To preserve a challenge to the admission of evidence for appeal, however, a party must object and "state[] the specific ground, unless it was apparent from the context." FED. R. EVID. 103(a)(1). When a party raises a new ground for his objection on appeal, we review only for plain error. *See United States v. David*, 96 F.3d 1477, 1481 (D.C. Cir. 1996); *accord* 1 MCCORMICK ON EVID. § 52 (8th ed. Jan. 2020 update).

## A.

Klayman first contends that the evidence of his forced resignation and name-calling of his ex-wife was irrelevant, but even if it was relevant, this evidence was too prejudicial to admit. Because he appears to have objected on this ground below, we review for abuse of discretion. *See Henderson*, 449 F.3d at 132–33. Under Federal Rule of Evidence 402, evidence must be relevant to be admissible. "Evidence is relevant if … it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." FED. R. EVID. 401.

The evidence regarding Klayman's forced resignation and name-calling of his ex-wife was relevant. Judicial Watch asserted that Klayman engaged in unfair competition in violation of the Lanham Act by falsely representing in his Saving Judicial Watch campaign that he left Judicial Watch to run for U.S. Senate. To prove those statements were false, Judicial Watch introduced the evidence that Klayman had been forced to resign due to his misconduct. This evidence of misconduct included his ex-wife's testimony about the vulgar names that Klayman had called her, and she included these allegations of verbal abuse in her divorce complaint, a copy of which Klayman had shown to Fitton and Orfanedes.

Accordingly, evidence that Klayman was forced to resign due to misconduct tended to make the fact that he left to run for Senate *less* probable than it would have been without that evidence. *See* FED. R. EVID. 401(a). And the fact of Klayman's departure was of consequence for Judicial Watch's Lanham Act claim because it had to prove that Klayman made a false representation. *See* FED. R. EVID. 401(b); *see also* 15 U.S.C. § 1125(a)(1). This evidence was therefore relevant.

Even if a piece of evidence is relevant, it may be inadmissible if it is unfairly prejudicial. FED. R. EVID. 403. "Unfair prejudice" means "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." FED. R. EVID. 403 advisory committee's note to 1972 amendment. This rule "tilts, as do the rules as whole, toward the admission of evidence in close cases." *Henderson*, 449 F.3d at 133 (cleaned up).

Klayman argues that the evidence of his forced resignation was substantially more prejudicial than probative. He contends that the jury hearing about his pursuit of a relationship with a Judicial Watch employee and his name-calling of his ex-wife prejudiced him by inciting the jury to decide based on emotion. We disagree. Klayman's pursuit of a relationship with an employee and alleged verbal abuse of his ex-wife had significant probative value because a central issue in the case was whether Klayman left Judicial Watch to run for Senate or whether he was forced to resign due to his misconduct. To be sure, evidence of his misconduct carried some risk of prejudice for Klayman. The district court acted within its discretion, however, to find that the risk did not substantially outweigh the evidence's probative value, particularly because "a district court virtually always is in the better position to assess the admissibility of the evidence in the context of the particular

case before it." *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 387 (2008).

B.

Klayman also argues that the evidence of his inappropriate relationship with a Judicial Watch employee constituted impermissible character evidence. In particular, he asserts that this evidence constituted "bad acts" admitted in violation of Federal Rule of Evidence 404(b). Klayman Br. 61. Although that rule prohibits the admission of evidence "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," it does not bar admission if the evidence is used for another permissible purpose. *See* FED. R. EVID. 404(b). Judicial Watch offered the evidence of Klayman's inappropriate relationship to prove that he was forced to resign due to his misconduct, thereby establishing that it was false for Klayman to advertise that he left Judicial Watch to run for Senate. Because the evidence was not admitted to show that Klayman acted in conformance with his character on a particular occasion, Rule 404(b) did not prohibit its admission.

VI.

We next address Klayman's challenges to the jury instructions, or more specifically, the lack of certain instructions. We review de novo the refusal to provide a requested instruction. *Czekalski v. LaHood*, 589 F.3d 449, 453 (D.C. Cir. 2009). Klayman challenges the district court's failure to give two instructions.

Klayman first contends the district court should have instructed the jury on the sanctions it issued against him—what he describes as an instruction on "why the case was tried in a

'bizarre' fashion." Klayman Br. 63 (capitalization omitted). His proposed instruction reads in full:

> The Court has imposed sanctions on Larry Klayman, which limits his ability to testify and present evidence to prove the counts of his second amended complaint against Judicial Watch and evidence of damages as well as in his defense. Larry Klayman contends that these sanctions were the result of personal animus towards him and my political prejudice against him, since I was appointed by President Bill Clinton and my husband actually defended Secret Service agents in the Monica Lewinsky scandal of the late 1990's. Larry Klayman has sued both Bill and Hillary Clinton many times, both as the founder, former chairman and general counsel of Judicial Watch, and thereafter.
>
> In addition, Larry Klayman contends that I have acted unethically and has filed two ethics complaints before the Judicial Council of this Court and has at least one pending now. Larry Klayman has previously moved to disqualify me under 28 U.S.C. § 144, and he contends that I necessarily should have recused myself under that statute or at least had another judge or judges rule on his motion. I refused to do either.

J.A. 2051.

This outlandish instruction is improper. Jury instructions are meant to "fairly present the applicable legal principles and standards." *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549,

556 (D.C. Cir. 1993) (cleaned up). Klayman's instruction states no law; it describes the fact of Klayman's sanctions tacked onto his contentions about the court's purported bias. A jury instruction is no place for a litigant's diatribe. The district court correctly refused to give Klayman's instruction.

Klayman also argues that the district court failed to properly instruct the jury on an element of trademark infringement. Judicial Watch asserted that Klayman infringed on its trademarks "Judicial Watch" and "Because No One is Above the Law." To establish trademark infringement, Judicial Watch needed to prove, among other elements, that Klayman's use of its trademarks created a "likelihood of confusion" among consumers. *See Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*, 896 F.3d 437, 456 (D.C. Cir. 2018). Klayman argues that the court erred by failing to instruct the jury that likelihood of confusion requires confusion by an "appreciable number" of consumers. But his only support for this proposition comes from two unpublished decisions of our district court, which are of course not precedential. *See In re Exec. Off. of President*, 215 F.3d 20, 24 (D.C. Cir. 2000).

Here the district court instructed the jury on the likelihood of confusion element by setting out factors to consider. The district court's instruction, "when viewed as a whole, … fairly present[ed] the applicable legal principles and standards." *Czekalski*, 589 F.3d at 453 (cleaned up). This circuit "has yet to opine on the precise factors courts should consider when assessing likelihood of confusion," but we have referred approvingly to the "multi-factor tests" of our sister circuits. *Am. Soc'y for Testing*, 896 F.3d at 456 (citing *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979), *abrogated on other grounds by Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792 (9th Cir. 2003); *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961)). The

district court's instruction was also based on a model instruction. *See* 3A Kevin F. O'Malley, et al., Fed. Jury Prac. & Instr. § 159:25 (6th ed. 2012); J.A. 2333. Neither our sister circuits nor the model instruction mention the number of consumers likely to be confused. No instruction on the number of consumers was required for the district court to fairly present the applicable legal principles on the confusion element.

To warrant provision to the jury, an instruction must fairly state the law as it is, not how a party wishes it to be. *See Joy*, 999 F.2d at 556. The district court did not err by refusing to add a component to its instruction on likelihood of confusion that has no basis in our precedent.

VII.

We finally consider the jury verdict against Klayman on Judicial Watch's breach of contract counterclaim. We review a district court's entry of judgment on a jury's verdict under a deferential standard. To overturn a jury verdict, a party must show that "the evidence and all reasonable inferences that can be drawn therefrom are so one-sided that reasonable men and women could not disagree." *Scott v. District of Columbia*, 101 F.3d 748, 753 (D.C. Cir. 1996). Klayman falls well short of satisfying this standard.

Judicial Watch asserted that Klayman breached the severance agreement by using its donor lists for his Senate campaign and Saving Judicial Watch. In the severance agreement, Klayman agreed that "following the Separation Date, he shall not retain or have access to any Judicial Watch donor or client lists or donor or client data." J.A. 2574. The jury found that Klayman breached the severance agreement by using Judicial Watch's donor list and awarded Judicial Watch $75,000 in damages for that claim.

Sufficient evidence supported the jury's verdict that Klayman accessed Judicial Watch's donor lists in violation of the severance agreement. For his Senate campaign's direct mailing efforts, Klayman contracted with ATA, Judicial Watch's vendor. The contract defined Klayman's "House File," which compiles the donors to be targeted by a campaign, as Judicial Watch donors who had given more than $5 in the last eighteen months. *See* J.A. 2746. Mark Fitzgibbons, an ATA employee, testified that Klayman's campaign specifically targeted Judicial Watch's donors. Indeed, Klayman admitted that, when he lost the Senate campaign, he started Saving Judicial Watch by using the names his Senate campaign had obtained from ATA. This evidence supports the jury's verdict that Klayman violated his agreement not to "have access to any Judicial Watch donor or client lists or donor or client data." J.A. 2574. And it certainly refutes Klayman's contention that the evidence was so skewed as to prevent a reasonable jury from concluding he violated the severance agreement.

Klayman maintains that ATA owned the donor names, which his campaign then rented, so "there was no illegal taking" of the Judicial Watch donor lists. Klayman Br. 80. Klayman's assertion is factually dubious,[4] but in any event legally irrelevant. The severance agreement does not turn on ownership of the donor names. Rather Klayman agreed to "not retain or have access to any Judicial Watch donor or client lists or donor or client data." J.A. 2574. Klayman has thus failed to

---

[4] The contract between ATA and Judicial Watch indicated that Judicial Watch owned the donor names. It stated that "[a]ll names, addresses and related information of contributors … developed under this Agreement … shall belong exclusively to the Client," meaning Judicial Watch. J.A. 2734; J.A. 2736 ("All donors, non-donors and related information … shall be the sole and exclusive property of Client.").

establish that the district court entered judgment on a jury verdict that was "so one-sided that reasonable men and women could not disagree." *Scott*, 101 F.3d at 753.

\* \* \*

Klayman's multitude of asserted errors fail. Judge Kollar-Kotelly presided over this litigation commendably, without any error that Klayman has identified. For the foregoing reasons, we affirm the district court in full. The district court did not err when it sanctioned Klayman, granted partial summary judgment, admitted evidence, instructed the jury, or entered judgment on the jury's verdict.

*So ordered.*